# Richmond

CHRISTIAN B. SMITH v. EDWIN H. MOOERS AND WILLARD A. MOOERS, INDIVIDUALLY AND AS COPARTNERS T/A MOOERS MOTOR CAR COMPANY.

June 14, 1965.

Record No. 5947.

Present, All the Justices.

*Israel Steingold* (*Steingold, Steingold & Chovitz*, on brief), for the plaintiff in error.

*Ernest G. Garrett, Jr.* (*John G. May, Jr.; May, Garrett, Miller, Newman & Compton*, on brief), for the defendants in error.

CARRICO, J., delivered the opinion of the court.

Christian B. Smith, the plaintiff, filed a motion for judgment against Edwin H. Mooers and Willard A. Mooers, individually and as copartners trading as Mooers Motor Car Company, the defendants. The motion sought the recovery of damages for personal injuries allegedly sustained by the plaintiff when he was involved in an accident while driving a used automobile which the defendants had for sale and which he was testing with a view to purchase.

A jury trial was held and, at the conclusion of the plaintiff's evidence, the trial court struck the evidence and entered summary judgment in favor of the defendants. A final order was entered embodying the court's rulings. The plaintiff was granted a writ of error.

In his motion for judgment, the plaintiff alleged that the tires on the vehicle he was testing were defective; that one of them blew out, causing the car to turn over, and that, as a result, he was seriously injured.

In one count of the motion for judgment, the plaintiff alleged that the defendants knew, or by the exercise of reasonable care should have known, that the tires were defective and negligently failed to equip the vehicle with safe tires or to warn him of the danger of using defective tires. In another count, the plaintiff alleged that the defendants expressly and impliedly warranted the safety and suitability of the vehicle and that they breached the warranties.

Other allegations of the motion for judgment were directed against Dunn's Service and Storage, Incorporated, also named as a party to the plaintiff's action. The motion alleged that Dunn's had recapped the tires in question and was liable to the plaintiff for negligence and breach of warranty. The question of the liability of Dunn's to the plaintiff is not involved in this appeal.

The evidence shows that Patty Raleigh Phillips was the owner of a 1958 model MGA two-passenger sports car. In March or April of 1961, she had two tires on the vehicle recapped by Dunn's. She kept the automobile for approximately one month after the tires were recapped, driving the vehicle less than five hundred miles during that period.

On approximately the first of May, 1961, Miss Phillips purchased a new automobile from the defendants and traded in the MGA as part of the purchase price. She testified that the tires on her old car "looked perfectly normal."

On May 5, 1961, the plaintiff called at the defendants' place of business in the city of Richmond because he "was interested in buy-

ing a small car that was economical." A salesman showed him the MGA which had been traded by Miss Phillips. The salesman said "it would be a good buy" and suggested that the plaintiff "take it out for a trial."

Accompanied by a friend, the plaintiff drove the vehicle along the streets of Richmond. After a short while, the right rear tire went flat. The tire was changed and the drive was then continued.

The plaintiff proceeded out Cary Street Road until he decided to take the car back. He turned to his left "to make a loop" on Bridgeway Lane. Just after he had rounded a curve to his right on that street, the left front tire blew out and the vehicle swerved to its left and overturned.

Andrew White, Research Director of the Motor Vehicle Research Institute of Lee, New Hampshire, was called by and testified as an expert witness for the plaintiff. The tire which had blown out was examined by Mr. White approximately fifteen months after the accident.

Mr. White stated that, upon inspection, he found the interior of the tire to be in good condition, with the exception of two breaks. He described one as a "clean cut" and the other as a "U-shaped break." The "clean cut" was caused, in the opinion of the witness, "by impact."

In discussing the U-shaped break, Mr. White explained that the wall of the tire was composed of four cord plies. He stated that by a process known as electromagnetic radiation, he found that the cords in the third and fourth, or outer, plies in the U-shaped break had been previously damaged before those in the first and second, or inner, plies failed. He expressed the opinion that the U-shaped break was caused by "a cord failure."

Mr. White also found evidence of pronounced "ozone checking on the outside of the tire." He explained that ozone checking was caused by the effect of ozone attacking the rubber in the tire. He said that "if you get an ozone crack opened and the tire is under stress, then you start to get instances of moisture through those ozone cracks. Normal cord tires . . . will accept moisture. When this occurs, the tire strength of the cord is weakened."

Mr. White testified that ozone checking could commence in a tire, under certain laboratory conditions, within an hour after its manufacture. He further stated that, even under normal conditions, deterioration from ozone checking would set in rapidly when the tire had been stored for six months.

The witness also testified that he found that there was a reversion in the rubber in the tire examined by him "due to over-curing" in the recapping process. In such a reversion, he said, the rubber becomes "sticky and very elastic", causing "the tire to become weaker." He stated that this condition could have been discovered by means of a test conducted with an instrument known as a durometer.

■ With respect to the count in his motion for judgment relating to negligence, the plaintiff contends that he made out a case against the defendants which should have been submitted to the jury.

The plaintiff, having alleged negligence, had the burden of proving that the defendants, when they furnished him with the MGA, failed to use ordinary care to see that the vehicle was reasonably safe for his test drive.

That burden required the plaintiff to show (1) that the tire was defective when the vehicle was turned over to him; (2) that the defects could have been discovered by a reasonable inspection, and (3) that such an inspection was not made by the defendants. And, although not pertinent here, the plaintiff's burden also required him to show that the alleged negligence of the defendants proximately caused his injuries.

The only direct testimony concerning the condition of the tire, as related to the date of the accident, came from Miss Phillips. She said that when she traded in the MGA, three or four days before the accident occurred, the tires "looked perfectly normal." This evidence can hardly be considered helpful to the plaintiff.

All of the other testimony concerning the condition of the tire was in the form of expert opinion expressed by the witness, Andrew White.

It should be noted, at this point, that this testimony was devoted exclusively to showing the alleged shortcomings of Dunn's in recapping the tire. Mr. White testified that the purpose of his examination "was to determine whether or not the carcass of the tire in question was in sufficiently good condition to be retreaded." He concluded that "a thorough examination of the carcass of this tire prior to retreading would have disclosed the weakened condition of the tire which failed under dynamic conditions."

We do not decide whether those things which the expert witness discovered about the tire should have been discovered also by an expert recapper. That it not the question before us. The question is whether there were defects in the tire which could have been detected by an ordinary car dealer conducting a reasonable in-

spection before permitting a prospective purchaser to test the vehicle. The testimony of Mr. White was patently insufficient to establish such an obligation upon the defendants.

The testimony of the witness was manifestly inconclusive to show that the ozone checking in the tire existed at the time the vehicle was furnished to the plaintiff. Mr. White candidly conceded that he did not know what the condition of the tire was in this respect at that time. This was so because, as he explained, ozone checking sets in rapidly after a tire has been stored for six months. The witness did not examine the tire until fifteen months after the accident. Under these circumstances, it is just as probable that the ozone checking occurred during the fifteen months of storage following the accident as that it existed before the accident.

The testimony of Mr. White was sufficient to show that there was a weakness in the cords of the tire on the date of the accident. But the same testimony made it clear that such weakness, which caused the cord failure and which in turn caused the U-shaped break in the tire, could not have been detected in any reasonable inspection conducted by the defendants. Until the break occurred, when the tire blew out, those cords were inside the wall of the tire, hidden from view. Even after the break occurred and the cords became visible, the expert found it necessary to use electromagnetic radiation, which shows "things that the human eye cannot see", to determine that the break resulted from cord failure.

Mr. White's testimony was also sufficient to show that there was a weakness in the rubber in the tire, on the date of the accident, caused by over-curing in the recapping process. But his testimony made it plain that the reversion in the rubber, which he asserted was caused by over-curing, could not have been discovered upon a reasonable inspection by the defendants. The expert found it necessary to subject the tire "to a series of what we call durometer tests" to detect that the tire had been weakened by over-curing.

Thus, the plaintiff's evidence failed to show the existence, at the time the vehicle was turned over to him, of the ozone checking in the tire. The defendants cannot be held for failing to discover something which was not shown to exist.

Those defects which were shown to exist could only have been detected by electromagnetic radiation or by durometer tests. The plaintiff conceded in the trial court that there was no duty on the defendants "to take the inner tube out and look at the inside of the tire." That being true, there was certainly no duty resting upon the

defendants to subject the tire to electromagnetic radiation or to durometer tests, in conducting a reasonable inspection.

Finally, the record discloses that the plaintiff produced no evidence that the defendants failed to inspect the MGA. The plaintiff concedes this, but argues that because he proved that the tire was defective and that "the defect could have been determined by visual inspection", he was entitled to an inference that no inspection was made.

The difficulty with the plaintiff's argument is that the inference contended for, that no inspection was made, must be based upon the proposition that the defect could have been discovered by visual inspection. As has been seen, that proposition was not proved by the plaintiff. He, then, really seeks to build an inference upon an inference, which the law does not permit him to do.

We conclude, therefore, that the plaintiff failed to carry the burden of proof with respect to the count in his motion for judgment alleging negligence against the defendants. The trial court, therefore, properly struck the evidence with respect to that count.

In the other count of his motion for judgment, the plaintiff alleged that the defendants expressly and impliedly warranted the safety and suitability of the MGA. In his brief, the plaintiff asserts that the trial court erred in striking his evidence as to both express and implied warranty.

There is not a word in the record to support any theory of express warranty in this case. In fact, the plaintiff's counsel stated to the trial court "I don't see any express warranty there." No further consideration will be given, therefore, to this point.

The plaintiff contends that when the defendants entrusted the MGA to him for trial, a bailment arose between them for their mutual benefit. He then argues that in such a bailment, "the bailor is liable for breach of implied warranty of merchantability." Such a warranty, the plaintiff says, means "that the thing sold is reasonably fit for the general purpose for which it is manufactured and sold."

The plaintiff cites a number of cases in an attempt to support his claim that the defendants impliedly warranted the safety and suitability of the MGA. The cases need not be listed here. We have examined each of them. They cannot be taken as authority for the proposition that there is an implied warranty when a used car is entrusted by an automobile dealer to a prospective purchaser for trial.

The most help the plaintiff can derive from the cases is that the dealer is under the duty to use ordinary care to see that the vehicle is reasonably fit for the prospective purchaser's use. This can serve the plaintiff little purpose. It has already been determined, in connection with the plaintiff's count involving negligence, that he was unable to carry his burden of proof and to show that the defendants failed to use ordinary care.

Moreover, even if it be assumed that there was a bailment for the mutual benefit of the plaintiff and the defendants, that does not mean that all of the usual attributes of such a bailment would attach to their relationship. It must be kept foremost in mind that the purpose behind the defendants' entrustment of the vehicle to the plaintiff was the prospect that they would make a sale to him.

The authorities appear to be of almost unanimous opinion that, independent of statute and in the absence of fraud, there is generally no implied warranty of quality or condition in the sale of a used car. 8 Am. Jur. 2d, § 655, p. 211; 77 C. J. S., § 330, p. 1186, at p. 1199; Annotation 78 A. L. R. 2d 460, at p. 493. No statute touching upon the question exists in Virginia and no fraud is involved in this case.

If there be no implied warranty in the sale of a used automobile, then a ruling that such a warranty attaches when the vehicle is merely being tested with a view to purchase would, indeed, rest upon shaky foundations. And yet, that is precisely the type of ruling which the plaintiff's argument invites us to make.

We decline that invitation and hold that no implied warranty of safety and suitability attached when the used MGA was delivered to the plaintiff by the defendants for a test drive. The trial court did not err, therefore, in striking the evidence relating to the count of the motion for judgment alleging a breach of implied warranty.

We find that the trial court properly entered summary judgment in favor of the defendants. Accordingly, the judgment is

*Affirmed.*