COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Benton, Elder, Bumgardner, Frank, Humphreys,
Clements, Felton, Kelsey, McClanahan and Haley
Argued at Richmond, Virginia


SAMANTHA LYNN MORRIS

                                                                    OPINION BY
v.       Record No. 1216-04-2                           JUDGE ROBERT P. FRANK
                                                                 NOVEMBER 22, 2005

COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
William R. Shelton, Judge Designate

Elizabeth P. Murtagh, Senior Assistant Public Defender (Office of
the Public Defender, on brief), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Judith Williams Jagdmann, Attorney General, on briefs), for appellee.


This matter comes before the Court on a rehearing *en banc* from a divided panel opinion

rendered May 10, 2005. In that opinion, a panel of this Court considered appellant's appeal of the

trial court's finding that the evidence was sufficient to convict her of two counts of felonious child

neglect in violation of Code § 18.2-371.1(B)(1). She contended the evidence was insufficient to

support the convictions because the Commonwealth did not prove she willfully failed to provide

care for her children in a manner so gross, wanton and culpable as to show a reckless disregard for

their lives. The majority agreed and reversed her convictions.

By order dated June 7, 2005, we granted the Commonwealth's petition for a rehearing *en

banc*, stayed the mandate of the panel decision, and reinstated the appeal. Upon rehearing *en banc*,

we affirm appellant's convictions.

When considering the sufficiency of the evidence on appeal of a criminal conviction, we view the evidence "in the light most favorable to the Commonwealth and grant all reasonable inferences fairly deducible therefrom." Ellis v. Commonwealth, 29 Va. App. 548, 551, 513 S.E.2d 453, 454 (1999). So viewed, the evidence established that appellant had two children, L.J. and S. As of September 29, 2003, L.J. was five-and-a-half years old and S. was two-and-a-half. L.J., who attended kindergarten, had hearing and speech impediments, suffered from chronic asthma, and wore hearing aids.

L.J. did not attend school on September 29, 2003. L.J. "had missed a fair number of days of school," and when Richard Goodin, a family support worker at L.J.'s school, was unable to contact appellant about L.J.'s absence by telephone, he went to her home "to see if [he] could be of any assistance." At about 9:30 a.m., Goodin knocked on the door of appellant's residence "several times." He heard a dog barking inside but "got no [other] response . . . for a significant amount of time." Goodin left and returned about 11:15 a.m. He again received no response to his knocking, but he also did not hear a dog barking, so he looked around the neighborhood. Playing in the woods about sixty feet away, he saw two children, one between four and six and another between two and three years old. The children were "interacting and laughing," "having a good time." The older child wore pants. The younger child was "completely naked" and "fairly dirty." He had a runny nose, dried fecal matter running down his leg, and "had significant chafing in and around his behind . . . ." The temperature outside was about 70 degrees.

Goodin knocked on several doors to see if he could determine to whom the children belonged, but when he received no response from any homes in the neighborhood, he called Child Protective Services and then 911. While waiting for the police to arrive, Goodin first watched the children from a distance and then took custody of the younger child when he started

to climb on an automobile "that was being worked on" in a nearby "parking spot." Goodin described the area as "dangerous" because of the presence of the car that was being worked on. Goodin also observed engine blocks and a weight bench with weights in the area "closer to the road." Goodin did not see any cars traveling on the road at that time.

The police arrived within five to fifteen minutes. Officer Raleigh Anderson knocked on the doors of the three residences, but received no responses. When he knocked at trailer number 1060, the door came open. He "announced county police" in a "loud" voice, "pretty much yelling at one time," but "nobody came to the door, so [he] pulled the door closed." Corporal James Larkin approached the older child to try to determine where he lived. Although Corporal Larkin later learned the group was standing "right outside of [the children's] home," Corporal Larkin said the older child could not give his name or say where he lived and "kept saying no" when Corporal Larkin asked if the younger child was his brother. Corporal Larkin could not understand what the child was saying. The older child then pointed to a location away from appellant's residence, and Corporal Larkin accompanied the older child in an effort to determine where he lived.

When Corporal Larkin and the older child walked away, the younger child became "pretty visibly upset," "started calling mommy," and ran toward trailer number 1060. The younger child "looked like he knew where he was going," so Officer Anderson followed him. The child pushed the door open and ran inside, and Officer Anderson followed him as he ran into one of the bedrooms in the back, still "calling mommy." When Officer Anderson saw a man and woman asleep in a dark bedroom, he stopped and "announced county police a couple of times." When he received no response, he backed out of the trailer and started "pounding on the door" with his fist while "announcing county police."

- 3 -

"After several times," the man came into the living room, in which cigarette butts and potato chips were "strewn all over the floor." Officer Anderson asked about the children, and the man went to get the woman. Appellant then came into the living room, identifying herself as Billie Jean Lloyd. She said she was just watching the children, who belonged to her sister, Samantha Morris. However, the younger child kept calling appellant "mommy" and "was getting kind of cuddly with her." Appellant then asked Officer Anderson where the five year old was. Anderson radioed Corporal Larkin that he had found the children's residence, and Anderson went to pick up Corporal Larkin and the older child and took them back to the residence.

Appellant kept maintaining that the children were her nephews "for a better part of the time--until [her] own mother showed up." In time, appellant admitted she was the children's mother and that her name was Samantha Morris. Appellant said she gave the false information because she was afraid that there were warrants for her arrest. When asked how the children came to be outside in that condition, she responded she was sleeping. She admitted the children had gotten out before, "a few days prior" and "that somebody in the [neighborhood] had to return them home." Corporal Larkin "verif[ied] that there weren't any warrants for [appellant's arrest]," then arrested her for the current offense. He did not remember whether there might have been an outstanding capias for appellant.

Appellant, who has a prior larceny conviction, testified at trial that the older child, L.J., had "great hearing loss in his left ear" and a lesser hearing loss in his right ear and that he had lost one of his hearing aids. He also had chronic asthma and an undiagnosed condition causing frequent pain in his left leg. "[H]e had been up the couple nights before," which caused him to "be tired in the mornings." Appellant testified that she "usually had to . . . get L.J. up pretty early, like six or so . . . because he was so hard to get out of the bed." When L.J. woke up on

- 4 -

September 29, 2003, he said he did not feel well. Because of L.J.'s complaint, coupled with the fact that his hearing aid was missing, appellant allowed him to stay home from school and planned to ask her mother to take them to the ear, nose and throat clinic that day to get a new hearing aid.

Appellant testified that she, L.J. and S. then sat on the couch watching cartoons. When S. looked as if he was getting ready to fall asleep, appellant asked L.J. if he wanted to take a nap and he said, "[S]ure." Appellant closed the curtains and turned on a fan. She also "locked the chain lock on the door and the door knob lock and then we went in and all laid down in the bed." Appellant fell asleep with the children in bed with her.

Appellant later awakened when she heard someone yelling, "Albemarle County Police." Appellant "knew that there was a capias out for [her] arrest for a failure to appear," so she sent the man into the living room to find out what was going on. Appellant admitted lying about her identity when she first spoke to the police, saying she did so because of the capias.

Appellant testified that she was in the process of toilet training S. by using "pull-ups." She said that when S. "soil[ed] himself when he was wearing a pull-up," he would often take it off himself, and she would clean him up and put a new one on him. She put a new pull-up on S. immediately before they went into the bedroom for a nap, and saw no chafing on S. at that time. She also testified that when she went to sleep, the living room floor was clean and was not covered with cigarette butts or potato chips.

Appellant denied "anything like this ever happened before with the children being out of the house like that." She said she told Corporal Larkin that she and S. "were taking a shower one day and that L.J. liked to sometimes let his dogs out and that, just by chance, [she and S.] were just getting out [of] the shower and [she] caught L.J.," but she denied "telling [the officers] anything as far as neighbors . . . bringing" the children home.

Appellant admitted in her trial testimony that she had a "significant substance abuse problem." She denied being under the influence of alcohol or drugs on September 29, 2003. She said that she had not used cocaine "around this time frame that the children were outside of [the] trailer" but that she had last used cocaine "[a]bout three days prior" to that incident.

In convicting appellant of the charged offenses, the trial court noted the following:

> [T]he [question] the Court's confronted with is . . . did she omit proper care of her children and [was] this omission, this negligence, . . . so great that it was wanton and likely to cause injury or which would make it not improbable that injury would be occasioned[.] [T]he facts that I've got are that somehow, she was so sound asleep, she was so deep in sleep that nothing would arouse her to alert her that her children were getting up and going outside and were outside for forty-five (45) minutes and that there were knocks at the door by Mr. Goodin . . . . There were knocks at the door by the police. There was shouting and whatever sleep she was in, it was so sound, it almost would require an earthquake to wake her up, and going to sleep in that fashion, and whatever caused that, with a five-year-old who I've heard is speech impaired, hearing impaired, had leg pain and a limp with chronic asthma and a two-year-old who can't communicate. So we've got kids that are wandering outside who cannot communicate, cannot tell anybody who they are, there are no other responsible adults around, the two-year[-]old's unclothed, Mr. Goodin says he finds them in a dangerous area and he searches for the parents, and she's so asleep that she can't be awakened to check on her children or know where her children are, and I think that meets the definition, coupled with what--that the neighbors [previously] brought the children back, that it was seventy (70) degrees, that she had awakened that morning, but couldn't remain alert enough to omit being negligent in caring for her children or . . . to be negligent in the omission of the care of her children, so I find her guilty . . . . [A]nd I add to that her credibility about not even being their mother. I think that factors in, too, in her omission in the care of her kids . . . .

## ANALYSIS

Appellant was convicted of violating Code § 18.2-371.1(B)(1), which provides in relevant part as follows:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care

- 6 -

of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

When considering on appeal the sufficiency of the evidence presented below, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002); see also McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (*en banc*). Under this standard, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Myers v. Commonwealth, 43 Va. App. 113, 118, 596 S.E.2d 536, 538 (2004) (citation omitted and emphasis in original). It asks instead whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original). Thus, we do not "substitute our judgment for that of the trier of fact" even if our opinion were to differ. Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002).

The Supreme Court recently clarified the element of intent required to support a conviction under this statute: "The term 'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another [that] will probably result in an injury." Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004); see also Correll v. Commonwealth, 269 Va. 3, 13, 607 S.E.2d 119, 124 (2005) (interpreting the meaning of "willful" in Code § 18.2-369, which proscribes abuse or neglect of incapacitated adults, adopting definition given "willful" under Code § 18.2-371.1(B)(1), that such conduct "'must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for

believing the conduct is lawful, or with a bad purpose'" (quoting Commonwealth v. Duncan, 267 Va. 377, 384, 593 S.E.2d 210, 214 (2004))). The issue of intent requires an examination not only of the act that created the risk but also of the degree to which the accused "was aware of the danger" that resulted from the act. Ellis, 29 Va. App. at 555, 513 S.E.2d at 457. A showing of "inattention and inadvertence," i.e. simple negligence, is insufficient to justify the imposition of a criminal penalty. Id. at 555-56, 513 S.E.2d at 457; see also Duncan, 267 Va. at 384, 593 S.E.2d at 214 ("[T]he statutory language does not apply to acts of simple negligence."). The negligence must be "gross negligence" and must be

> "accompanied by acts of commission or omission of a wanton or willful nature, showing a reckless disregard or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of [her] acts."

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).

"'[W]hether the required intent exists is generally a question for the trier of fact.'" Haywood v. Commonwealth, 20 Va. App. 562, 565-66, 458 S.E.2d 606, 607-08 (1995) (quoting Nobles v. Commonwealth, 218 Va. 548, 551, 238 S.E.2d 808, 810 (1977)).

Applying these principles in Barrett, the Supreme Court affirmed appellant's conviction for neglect of her daughter that resulted when the two year old placed her ten-month-old brother in the bathtub, where he drowned. Barrett, 268 Va. at 183-86, 597 S.E.2d at 110-12. The evidence established that Barrett knew her daughter was jealous of the infant and had a "propensity for attempting to injure [him]." Id. at 184, 597 S.E.2d at 111. Barrett also knew her daughter loved to play in the bathtub, was able to climb in and operate the tub's faucets by herself, and had previously pulled the infant, "head first," into the bathtub with her. Id. at 185,

- 8 -

597 S.E.2d at 111-12.  Finally, Barrett acknowledged that the sound of water running in the bathroom was audible from other parts of the home.  Id.

The evening before the infant drowned, Barrett stayed out all night drinking beer.  Id. at 185, 597 S.E.2d at 112.  She drove home at 6:00 a.m. and acknowledged that she was still intoxicated enough at that time to have been arrested for driving under the influence.  Id.  Sometime that morning, while "still intoxicated as well as tired," Barrett fell asleep at a time when she "[knew] she was the only one left in the apartment to supervise the children."  Id.  Barrett contended that "[w]hile [her] falling asleep was not without remorse and blame, it does not rise to the level of a willful act or omission committed with a bad intent, a bad purpose, or a conscious disregard for human life."  Id. at 184, 597 S.E.2d at 111.  The Court disagreed, stressing that Barrett would have the Court focus on her "act of falling asleep" in a vacuum when it must be viewed in light of all the circumstances preceding and surrounding the tragic events.  Id.  When so viewed, the circumstances show beyond all reasonable doubt that Barrett was guilty of more than "ordinary negligence."  Id.  She was fully aware of the older child's earlier attempt to injure the baby, but recklessly disregarded those warning symptoms in neglect of her duty to protect both children.  Id.

The dissent opines that Ellis controls.  We disagree.

Ellis involved a mother who turned on a burner of her apartment's gas stove to light a cigarette and then left the apartment to visit a friend in a nearby apartment while her two young children were napping.  Ellis, 29 Va. App. at 551-52, 513 S.E.2d at 455.  A fire broke out in Ellis's apartment shortly after she left.  Id. at 552-53, 513 S.E.2d at 455.  In reversing Ellis's conviction, we reasoned as follows:

> While appellant . . . purposefully and intentionally left her
> apartment . . . , the intent which is relevant to our determination of
> "bad purpose" does not relate simply to why she left the apartment.
> Rather, it relates to the degree to which she was aware of the

- 9 -

danger when leaving her children unattended. Here, no evidence establishes that . . . she acted with knowledge or consciousness that her children would be injured as a likely result of her departure to visit a neighbor for a short period of time in another residential building.

[Further, the evidence] fails to show that appellant left the apartment knowing the burner was on and in conscious disregard of the likely ignition of a grease fire that would ultimately endanger the lives of her children. . . .

. . . [I]nattention and inadvertence have not been heretofore equated with actions taken willfully, thus making them subject to criminal penalty. Similarly, appellant's inability to "see anything wrong with what she had done by going outside and leaving the children alone in the apartment," while clearly misguided, is reflective of simple negligence, not criminal conduct.

Id. at 555-56, 513 S.E.2d at 457 (citations omitted).

Here, as in Barrett, the trial court found that appellant was in such a deep sleep that "she can't be awakened to check on her children or know where her children are." Noting L.J.'s physical disabilities and S.'s young age, the court concluded that appellant omitted to take proper care of her children and that this omission was "so great that it was wanton and likely to cause injury of which would make it not improbable that injury would be occasioned."

Unlike Ellis, there is ample evidence in the record to support the trial court's finding. Specifically, we note L.J.'s inability to hear sounds that a non-impaired child would recognize as signs of danger. At oral argument, appellant acknowledged that parents of children with special needs are confronted with a heightened responsibility of supervising those children. Yet, while fully aware of her children's limitations, appellant, a self-admitted drug user, fell into such a coma-like sleep for several hours during the daytime that she was unable to respond to banging on her door and a barking dog. Appellant did not waken by the disruption of her children getting out of her bed, and she did not respond to S.'s cries for his "mommy," nor to the officer's entry into the trailer announcing he was a police officer. Further, fecal matter on S.'s legs, having had

- 10 -

time to dry and S. having developed significant "chafing on his behind," indicates that the children had been left unattended for a substantial period of time.

Thus, appellant "created a situation 'reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned, and [she knew], or [was] charged with the knowledge of, the probable results of [her] acts.'" Barrett, 268 Va. at 184, 597 S.E.2d at 111 (quoting Cable, 243 Va. at 240, 415 S.E.2d at 220).

A reasonable fact finder could infer, based on common knowledge, that appellant knew there were inherent dangers in leaving the young children unattended during the day. See Duncan, 267 Va. at 386, 593 S.E.2d at 215 (noting that the fact finder could infer, by common knowledge, the dangers "inherent in such a situation"). The record supports the trial court's conclusion that, in view of the special vulnerability of her children, appellant willfully exposed her children to a substantial risk of serious injury or death by falling into such a deep and inert sleep before adequately securing the safety of her children.

Accordingly, appellant's convictions are affirmed.

Affirmed.

Elder, J., with whom Benton and Humphreys, JJ., join, dissenting.

I believe the evidence was insufficient to support Samantha Morris's convictions for felonious child neglect, in violation of Code § 18.2-371.1(B)(1), because the evidence did not prove she willfully failed to provide care for her children in a manner so gross, wanton and culpable as to show a reckless disregard for their lives. Thus, I would reverse the convictions, and I respectfully dissent.

When considering the sufficiency of the evidence to support a conviction on appeal, we view the evidence "in the light most favorable to the Commonwealth and grant all reasonable inferences fairly deducible therefrom." Ellis v. Commonwealth, 29 Va. App. 548, 551, 513 S.E.2d 453, 454 (1999). "Where inferences are relied upon to establish guilt," however, "they must point to guilt so clearly that any other conclusion would be inconsistent therewith." Dotson v. Commonwealth, 171 Va. 514, 518, 199 S.E. 471, 473 (1938). Thus,

> All necessary circumstances proved must be consistent with guilt and inconsistent with innocence. It is not sufficient that the evidence create a suspicion of guilt, however strong, or even a probability of guilt, but must exclude every reasonable hypothesis save that of guilt.

Webb v. Commonwealth, 204 Va. 24, 34, 129 S.E.2d 22, 29 (1963). "There is no stronger presumption afforded than that an accused is presumed to be innocent, which cannot be overthrown except by proof of his guilt beyond a reasonable doubt." Dotson, 171 Va. at 517, 199 S.E. at 473; see Commonwealth v. Hudson, 265 Va. 505, 513-14, 578 S.E.2d 781, 785-86 (2003).

### A.

Intent, like any other element of a crime, may be proved by circumstantial evidence. However, to establish the requisite level of criminal intent beyond a reasonable doubt, the evidence must exclude all reasonable hypotheses of innocence. See, e.g., Rice v.

Commonwealth, 16 Va. App. 370, 372, 429 S.E.2d 879, 880 (1993). Because I believe the Commonwealth failed to exclude a reasonable hypotheses of innocence—specifically, that Morris did not intentionally or knowingly fall into a heavy slumber—I would reverse her convictions for felony child neglect.

The Supreme Court recently clarified the element of intent required to support a conviction under Code § 18.2-371.1: "The term 'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another [that] will probably result in an injury." Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004). Thus, the issue of intent requires an examination not only of the act that created the risk, but also of the degree to which the accused "was aware of the danger" that resulted from the act. Ellis, 29 Va. App. at 555, 513 S.E.2d at 457. A showing of "inattention and inadvertence," *i.e.*, simple negligence, is therefore insufficient to justify the imposition of a criminal penalty. Id. at 555-56, 513 S.E.2d at 457; see also Commonwealth v. Duncan, 267 Va. 377, 384, 593 S.E.2d 210, 214 (2004) ("[T]he statutory language does not apply to acts of simple negligence."). Rather, the negligence must be "gross negligence" and must be

> "accompanied by acts of commission or omission of a wanton or willful nature, showing a reckless disregard or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of [her] acts."

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).

Under the circumstances of this case, the Commonwealth failed to prove that Morris willfully engaged in the conduct allegedly constituting the act of neglect. Although the majority asserts that the evidence was sufficient to establish that Morris "willfully" fell into a deep sleep,

- 13 -

thereby creating the risk of harm to her children, the Commonwealth failed to present any evidence—beyond speculation—that Morris purposefully engaged in any act knowing that it would cause her to fall asleep. Thus, the evidence leaves open a reasonable hypothesis of innocence: Morris accidentally fell into a deep sleep and, while she continued to nap, her children woke up and left the trailer without her knowledge.

First, the evidence presented at trial was insufficient to establish that Morris knew her children might leave the trailer while she was taking a nap. As Morris argued at trial, the record, even viewed in the light most favorable to the Commonwealth, contains little information surrounding the previous occasion during which Morris's children left the residence on their own and had to be returned by a neighbor. Thus, the record leaves open the reasonable hypothesis that, on that prior occasion, Morris failed to secure the door to the residence and that, on this subsequent occasion, she was entitled to conclude that engaging the door's lock and chain would keep her children from leaving the trailer. The fact that Morris's actions did not eliminate all risk to her children was insufficient to prove criminal negligence. As we recognized in Ellis, "willful maltreatment of a child requires 'something worse than good intentions coupled with bad judgment.'" 29 Va. App. at 556, 513 S.E.2d at 457 (quoting Mullen v. United States, 263 F.2d 275, 276 (D.C. Cir. 1958)); cf. Kelly v. Commonwealth, 42 Va. App. 347, 355-57, 592 S.E.2d 353, 357-58 (2004) (upholding conviction where defendant left twenty-one-month-old child strapped in car seat for seven hours, resulting in child's death, and evidence established that, on three previous occasions over period of years, neighbors had to alert defendant to fact that a child had been left locked inside one of defendant's vehicles).

Second, no evidence indicates Morris was under the influence of any intoxicants that caused her to sleep so soundly she would not know whether the children had left the residence. Although Morris admitted she had a "significant" cocaine problem as of the date of trial on

- 14 -

February 3, 2004, no evidence established the degree of her cocaine use in September 2003. And, although Morris testified that, prior to the children's escape on September 29, 2003, she had used cocaine three days earlier, the Commonwealth presented no evidence contradicting her further testimony that, at the time of the children's escape, she was not under the influence of any intoxicants that would have diminished her awareness of the children's whereabouts or her ability to care for them.[1] Indeed, the trial court's finding that "*somehow*, she was so sound asleep" is an explicit indication that it did not attribute Morris's deep sleep to any specific cause. (Emphasis added).

To conclude—as does the majority—that Morris was under the influence of drugs on the date in question, we would be required to stack inference upon inference. Specifically, we would be required to infer that: (1) because Morris had a "significant" cocaine problem in February 2004, she had a "significant" cocaine problem in September 2003; and (2) because she had a "significant" cocaine problem in 2003, she used cocaine on the day in question; and (3) while using cocaine on the day in question, she took enough cocaine that she knew she might pass out; and (4) because she did, in fact, pass out, she was unable to care for her children. This structure of inferences renders the majority's conclusion—that Morris was unable to care for her children because she was under the influence of drugs—completely speculative. It therefore fails as a matter of law. See Dunn v. Commonwealth, 222 Va. 704, 705-06, 284 S.E.2d 792, 793 (1981) ("Verdict[s] . . . based only upon speculation and conjecture . . . cannot be permitted to stand."); see also Smith v. Mooers, 206 Va. 307, 312, 142 S.E.2d 473, 477 (1965) ("[The appellant] seeks to build an inference upon an inference, which the law does not permit him to do.").

---

[1] The fact that the trial court made a general finding that appellant did not give credible testimony does not provide affirmative evidence that her functioning was, in fact, impaired on the morning in question, either because she was under the influence of cocaine or some other intoxicant or was unusually tired because of their earlier use. See, e.g., Tarpley v. Commonwealth, 261 Va. 251, 256-57, 542 S.E.2d 761, 764 (2001).

The majority, however, relies on the fact that Morris "fell into such a coma-like sleep for *several hours* during the daytime that she was *unable* to respond" to (1) "*banging* on her door and a barking dog" at about 9:30 a.m., and (2) "S's cries for his 'mommy'" and "the officer's entry into the trailer announcing he was a police officer" at around 11:30 a.m. (Emphases added). This conclusion is also unsupported by the evidence. Although elementary school employee Richard Goodin apparently was unable to rouse Morris when he first visited the residence at 9:30 a.m., no evidence established that Morris should have been able to hear what Goodin described as "knocking," not "banging," from her position in the bedroom or that she had any duty to respond to his knocking, or to the sound of her barking dog, even if she did. Most importantly, no evidence established that the children were awake at that time. Goodin did not see anyone in or around the home, and the only sound he heard was the barking of the dog. Not until Goodin returned at 11:15 a.m. did he first see the children playing, unsupervised, outside the residence. Although Goodin testified that he waited five to fifteen minutes for the police to respond to his 911 call, no evidence established how much time elapsed from when he first arrived at the residence until Morris was awakened and again able to care for her children. Thus, the majority's conclusion that Morris "fell into such a coma-like sleep for *several hours* during the daytime that she was *unable* to respond" to the needs of her children is not the only reasonable hypothesis flowing from the evidence. (Emphases added).

Accordingly, in the absence of evidence either (1) that, on some prior occasion, the two- and five-year-old children opened a locked and chained door in order to leave the residence, or (2) that their mother was under the influence of drugs or other self-administered intoxicants causing her to sleep so soundly or for so long that she was unable to render adequate supervision, I am unwilling to conclude that a mother who naps with her children but fails to awaken when the children arise is guilty of criminal negligence, whether or not she is aware that she is a

- 16 -

particularly sound sleeper. Morris's napping during the day while her partially clad five- and two-year-old children managed to open the front door and go out to play in the neighborhood amounted, *at most*, to bad judgment or simple negligence, not the criminal negligence necessary to support a conviction under Code § 18.2-371.1(B)(1).

B.

The majority, however, relying principally upon Barrett, concludes that Morris's "willful" act of falling asleep constituted criminal negligence. For the reasons that follow, I do not believe that Barrett is persuasive under the circumstances of this case. Rather, I believe that the circumstances presented in Ellis are more analogous to this case and, therefore, mandate reversal of Morris's conviction. In Barrett, the Supreme Court affirmed a conviction for felony child neglect where a ten-month-old infant's two-year-old sister placed him in the bathtub, where he drowned. 268 Va. at 183-86, 597 S.E.2d at 110-12. The conviction at issue under Code § 18.2-371.1(B)(1) involved Barrett's neglect of her daughter, who suffered no physical injuries. Id. at 186, 597 S.E.2d at 112. The evidence established that Barrett knew her daughter was jealous of the infant and had a "propensity for attempting to injure [him]." Id. at 184, 597 S.E.2d at 111. Barrett also knew her daughter loved to play in the bathtub, was able to climb in and operate the tub's faucets by herself, and had previously pulled the infant, "head first," into the bathtub with her. Id. at 185, 597 S.E.2d at 111-12. Finally, Barrett acknowledged that the sound of water running in the bathroom was audible from other parts of the home. Id.

The evening before the infant drowned, Barrett stayed out all night drinking beer. Id. at 185, 597 S.E.2d at 112. She drove home at 6:00 a.m. and acknowledged that she was still intoxicated enough at that time to have been arrested for driving under the influence. Id. Sometime that morning, while "still intoxicated as well as tired," Barrett fell asleep at a time when she "[knew] she was the only one left in the apartment to supervise the children." Id.

- 17 -

The Court held "the jury could have concluded that Barrett's conduct was willful and accompanied by acts of omission of a wanton nature showing a reckless or indifferent disregard of the life and health of both children. . . . What we have here is the story of a disaster just waiting to happen . . . ." Id. at 185-86, 597 S.E.2d at 112. The Supreme Court distinguished its decision in Barrett from our earlier decision in Ellis, reasoning that Barrett's neglect was willful whereas Ellis's neglect was inadvertent. Id. at 186 n.8, 597 S.E.2d at 112 n.8.

Ellis involved a mother who turned on a burner of her apartment's gas stove to light a cigarette and then left the apartment to visit a friend in a nearby apartment while her two young children were napping. Ellis, 29 Va. App. at 551-52, 513 S.E.2d at 455. A fire broke out in Ellis's apartment shortly after she left. Id. at 552-53, 513 S.E.2d at 455. In reversing Ellis's conviction, we reasoned as follows:

> While appellant . . . purposefully and intentionally left her apartment . . . , the intent which is relevant to our determination of "bad purpose" does not relate simply to why she left the apartment. Rather, it relates to the degree to which she was aware of the danger when leaving her children unattended. Here, no evidence establishes that . . . she acted with knowledge or consciousness that her children would be injured as a likely result of her departure to visit a neighbor for a short period of time in another residential building.
>
> [Further, the evidence] fails to show that appellant left the apartment knowing the burner was on and in conscious disregard of the likely ignition of a grease fire that would ultimately endanger the lives of her children. . . .
>
> . . . [I]nattention and inadvertence have not been heretofore equated with actions taken willfully, thus making them subject to criminal penalty. Similarly, appellant's inability to "see anything wrong with what she had done by going outside and leaving the children alone in the apartment," while clearly misguided, is reflective of simple negligence, not criminal conduct.

Id. at 555-56, 513 S.E.2d at 457 (citations omitted).

I would hold that Morris's conduct was more akin to Ellis's than Barrett's because the evidence failed to show Morris "was [or should have been] aware of the danger" that resulted from her acts. See Ellis, 29 Va. App. at 555, 513 S.E.2d at 457; see also Barrett, 268 Va. at 184, 597 S.E.2d at 111 (requiring proof that defendant "'[knew], or [was] charged with the knowledge of, the probable results of [her] acts'" (quoting Cable, 243 Va. at 240, 415 S.E.2d at 220)); Mangano v. Commonwealth, 44 Va. App. 210, 215, 604 S.E.2d 118, 120 (2004) (noting that the "distinguishing feature between Barrett and Ellis is an awareness of the likely danger in the defendant's conduct"). Unlike Barrett, no evidence established that Morris failed to take steps to prevent the recurrence of a prior similar event or engaged in purposeful conduct knowing it would expose her children to a substantial risk of harm. Accordingly, I believe that Barrett is inapplicable under the circumstances of this case. Rather, as in Ellis, Morris's "inattention and inadvertence . . . is reflective of simple negligence, not criminal conduct." Ellis, 29 Va. App. at 555-56, 513 S.E.2d at 457.

C.

As noted by the Supreme Court of Virginia, "[l]ike any other element[] of a crime, [intent] must be proved beyond a reasonable doubt and not left to speculation." Caminade v. Commonwealth, 230 Va. 505, 510, 338 S.E.2d 846, 849 (1986). By the failure of the Commonwealth to prove that Morris engaged in any conduct knowing that it would cause her to fall asleep and, therefore, be unable to watch over her children, the trial court could only speculate as to whether Morris intended to commit the act that caused her to be unable to supervise her children. The trial court's finding that "somehow, she was so sound asleep" is an explicit indication that it did not attribute Morris's deep sleep to any particular cause. And, because the Commonwealth did not exclude all reasonable hypotheses of innocence, the evidence was insufficient, as a matter of law, to establish that Morris willfully engaged in the

- 19 -

alleged conduct with the knowledge that she was exposing her children to a substantial risk of bodily harm. Because I would hold the evidence was insufficient to prove criminal negligence, I would reverse and dismiss Morris's convictions for violating Code § 18.2-371.1(B)(1). Thus, I respectfully dissent.

Tuesday        7th

June, 2005.

Samantha Lynn Morris,                              Appellant,

against          Record No. 1216-04-2
                  Circuit Court Nos. 16,835 and 16,836

Commonwealth of Virginia,                       Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On May 24, 2005 came the appellee, by the Attorney General of Virginia, and filed a petition praying that the Court set aside the judgment rendered herein on May 10, 2005, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered herein on May 10, 2005 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellee shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter.  It is further ordered that the appellee shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Present:   Judges Elder, Frank and Humphreys
Argued at Richmond, Virginia


SAMANTHA LYNN MORRIS

MEMORANDUM OPINION* BY
v.        Record No. 1216-04-2                JUDGE LARRY G. ELDER
                                              MAY 10, 2005
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
William R. Shelton, Judge Designate

Elizabeth P. Murtagh, Senior Assistant Public Defender (Office of
the Public Defender, on briefs), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Judith W. Jagdmann, Attorney General, on brief), for appellee.


Samantha Lynn Morris (appellant) appeals from her bench trial convictions for two counts

of felonious child neglect in violation of Code § 18.2-371.1(B).[1]  On appeal, she contends the

evidence was insufficient to support the convictions because it did not prove she willfully failed to

provide care for her children in a manner so gross, wanton and culpable as to show a reckless

disregard for their lives.  We agree and reverse the convictions.

BACKGROUND

When considering the sufficiency of the evidence on appeal of a criminal conviction, we

view the evidence "in the light most favorable to the Commonwealth and grant all reasonable

inferences fairly deducible therefrom."  Ellis v. Commonwealth, 29 Va. App. 548, 551, 513

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Judge Paul M. Peatross, Jr., was the trial judge who ruled on the issue that is the subject
of this appeal.  Judge Shelton was the sentencing judge.

S.E.2d 453, 454 (1999). So viewed, the evidence established that appellant had two children, L.J. and S. As of September 29, 2003, L.J. was five-and-a-half years old and S. was two-and-a-half. L.J., who attended kindergarten, had hearing and speech impediments and wore hearing aids.

L.J. did not attend school on September 29, 2003. L.J. "had missed a fair number of days of school," and when Richard Goodin, a family support worker at L.J.'s school, was unable to contact appellant about L.J.'s absence by telephone, he went to her home "to see if [he] could be of any assistance." At about 9:30 a.m., Goodin knocked on the door of appellant's residence "several times." He heard a dog barking inside but "got no [other] response . . . for a significant amount of time." Goodin left and returned about 11:15 a.m. He again received no response to his knocking, but he also did not hear a dog barking, so he looked around the neighborhood. Playing in the woods about sixty feet away, he saw two children, one between four and six and another between two and three years old. The children were "interacting and laughing," "having a good time." The older child wore pants. The younger child was "completely naked" and "fairly dirty." He had a runny nose and dried fecal matter running down his leg. The temperature was about 70 degrees.

Goodin knocked on several doors to see if he could determine to whom the children belonged, but when he received no response from any homes in the neighborhood, he called Child Protective Services and then 911. While waiting for the police to arrive, Goodin first watched the children from a distance and then took custody of the younger one when he started to climb on an automobile "that was being worked on" in a nearby "parking spot." Goodin viewed the area as "dangerous" because of the presence of the car that was being worked on, as well as engine blocks and a weight bench with weights on it, and the fact that it was "closer to the road," although he did not see any cars traveling on the road at that time.

- 2 -

The police arrived within five to fifteen minutes. Officer Raleigh Anderson knocked on the doors of the residences numbered 1058, 1059 and 1060, but received no response. When he knocked on the door of 1060, the door came open. He "announced county police" in a "loud" voice, "pretty much yelling at one time," but "nobody came to the door, so [he] pulled the door closed." Corporal James Larkin approached the older child to try to determine where he lived. Larkin could not understand what the child was saying. Although Larkin later learned the group was standing "right outside of [the children's] home," Larkin said the older child could not give his name or say where he lived and "kept saying no" when Larkin asked if the younger child was his brother. The older child then pointed to a location away from appellant's residence, and Corporal Larkin accompanied the older child in an effort to determine where he lived.

At the same time, Officer Anderson tended to the younger child. When Corporal Larkin and the older child walked away, the younger child became "pretty visibly upset," "started calling mommy," and ran toward the trailer numbered 1060. The younger child "looked like he knew where he was going," so Officer Anderson followed him. The child pushed the door open and ran inside, and Officer Anderson followed him as he ran toward one of the bedrooms in the back of the trailer still "calling mommy." When Officer Anderson saw a man and woman asleep in a dark bedroom, he stopped and "announced county police a couple of times." When he received no response, he backed out of the trailer and started "pounding on the door" with his fist while "announcing county police."

"After several times," the man came into the living room, in which cigarette butts and potato chips were "strewn all over the floor." Officer Anderson asked about the children, and the man went to get the woman. Appellant then came into the living room. She identified herself as Billie Jean Lloyd and said she was just watching the children, who belonged to her sister, Samantha Morris. However, the younger child kept calling appellant "mommy" and "was

getting kind of cuddly with her." Appellant then asked Officer Anderson where the five year old was. Anderson radioed Corporal Larkin that he had found the children's residence, and Anderson went to pick up Corporal Larkin and the older child and took them back to the residence.

Appellant kept maintaining that the children were her nephews "for a better part of the time--until [her] own mother showed up." After appellant and her mother had some private conversations, she admitted she was the children's mother and that her name was Samantha Morris. Appellant said she gave the false information because she was afraid that there were warrants for her arrest. When asked how the children came to be outside in that condition, she said she was sleeping. She admitted the children had gotten out before, "a few days prior" and "that somebody in the [neighborhood] had to return them home." Corporal Larkin "verif[ied] that there weren't any warrants for [appellant's arrest]," and he arrested her for the contemporaneous offense involving her children. He did not remember whether there might have been an outstanding capias for appellant.

Appellant, who had a prior larceny conviction, was charged with the instant offenses. At trial, the Commonwealth presented evidence in keeping with the above. Appellant testified in her defense, saying that the older child, L.J., had "great hearing loss in his left ear" and a lesser hearing loss in his right ear and that he had lost one of his hearing aids. He also had chronic asthma and an undiagnosed difficulty causing frequent pain in his left leg, and "he had been up the couple nights before," which caused him to "be tired in the mornings." Appellant testified that she "usually had to . . . get L.J. up pretty early, like six or so . . . because he was so hard to get out of the bed." When L.J. woke up on September 29, 2003, he said he did not feel well. Because of L.J.'s complaint, coupled with the fact that his hearing aid was missing, appellant

decided to let him stay home from school and planned to call her mother to take them to the ear, nose and throat clinic that day to get a new hearing aid.

Appellant, L.J. and S. then sat on the couch watching cartoons. When S. looked as if he was getting ready to fall asleep, appellant asked L.J. if he wanted to take a nap and he said, "[S]ure." Appellant then closed the curtains and turned on a fan. She also "locked the chain lock on the door and the door knob lock and then we went in and all laid down in the bed." Appellant fell asleep. Appellant said the man police later saw in the bed was a friend who had remained in bed asleep while she was up with the children.

Appellant later awakened when she heard someone yelling, "Albemarle County Police." Appellant "knew that there was a capias out for [her] arrest for a failure to appear," so she sent her friend into the living room to find out what was going on. Appellant admitted lying about her identity when she first spoke to the police, saying she did so because of the capias.

Appellant testified that she was in the process of potty training S. by using pull-ups, diapers that functioned like underwear. She said that when S. "soil[ed] himself when he was wearing a pull-up," he would often take it off himself, and she would clean him up and put a new one on him. She put a new pull-up on S. immediately before they went into the bedroom for a nap. She also testified that when she went to sleep, the living room floor was clean and was not covered with cigarette butts or potato chips.

Appellant denied that "anything like this ever happened before with the children being out of the house like that." She said she told Corporal Larkin that she and S. "were taking a shower one day and that L.J. liked to sometimes let his dogs out and that, just by chance, [she and S.] were just getting out [of] the shower and [she] caught L.J.," but she denied "telling [the officers] anything as far as neighbors . . . bringing" the children home.

Appellant admitted that, at the time of the February 3, 2004 hearing, she had a "significant substance abuse problem." She denied being under the influence of alcohol or drugs on September 29, 2003. She said that she had not used cocaine "around this time frame that the children were outside of [the] trailer" and that she had last used cocaine "[a]bout three days prior" to that incident.

In convicting appellant of the charged offenses, the trial court noted the following:

> [T]he [question] the Court's confronted with is . . . did she omit proper care of her children and [was] this omission, this negligence, . . . so great that it was wanton and likely to cause injury or which would make it not improbable that injury would be occasioned[.]  [T]he facts that I've got are that somehow, she was so sound asleep, she was so deep in sleep that nothing would arouse her to alert her that her children were getting up and going outside and were outside for forty-five (45) minutes and that there were knocks at the door by Mr. Goodin . . . .  There were knocks at the door by the police.  There was shouting and whatever sleep she was in, it was so sound, it almost would require an earthquake to wake her up, and going to sleep in that fashion, and whatever caused that, with a five-year-old who I've heard is speech impaired, hearing impaired, had leg pain and a limp with chronic asthma and a two-year-old who can't communicate.  So we've got kids that are wandering outside who cannot communicate, cannot tell anybody who they are, there are no other responsible adults around, the two-year[-]old's unclothed, Mr. Goodin says he finds them in a dangerous area and he searches for the parents, and she's so asleep that she can't be awakened to check on her children or know where her children are, and I think that meets the definition, coupled with what--that the neighbors [previously] brought the children back, that it was seventy (70) degrees, that she had awakened that morning, but couldn't remain alert enough to omit being negligent in caring for her children or . . . to be negligent in the omission of the care of her children, so I find her guilty . . . .  [A]nd I add to that her credibility about not even being their mother.  I think that factors in, too, in her omission in the care of her kids . . . .

## ANALYSIS

Appellant was convicted of violating Code § 18.2-371.1(B)(1), which provides in relevant part as follows:

- 6 -

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

The Supreme Court recently clarified the element of intent required to support a conviction under this statute: "The term 'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another [that] will probably result in an injury." Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004); see also Correll v. Commonwealth, 269 Va. 3, 13, 607 S.E.2d 119, 124 (2005) (in interpreting the meaning of "willful" in Code § 18.2-369, which proscribes abuse or neglect of incapacitated adults, adopting definition given "willful" under Code § 18.2-371(B)(1), that such conduct "'must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose'" (quoting Commonwealth v. Duncan, 267 Va. 377, 384, 593 S.E.2d 210, 214 (2004))). The issue of intent requires an examination not only of the act that created the risk but also of the degree to which the accused "was aware of the danger" that resulted from the act. Ellis, 29 Va. App. at 555, 513 S.E.2d at 457. A showing of "inattention and inadvertence," i.e. simple negligence, is insufficient to justify the imposition of a criminal penalty. Id. at 555-56, 513 S.E.2d at 457; see also Duncan, 267 Va. at 384, 593 S.E.2d at 214 ("[T]he statutory language does not apply to acts of simple negligence."). The negligence must be "gross negligence" and must be

> "accompanied by acts of commission or omission of a wanton or willful nature, showing a reckless disregard or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of [her] acts."

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).

Applying these principles in Barrett, the Supreme Court affirmed the conviction at issue, which resulted when a ten-month-old infant's two-year-old sister placed him in the bathtub, where he drowned. Id. at 183-86, 597 S.E.2d at 110-12. The conviction at issue under Code § 18.2-371.1(B)(1) involved Barrett's neglect of her daughter, who suffered no physical injuries. Id. at 186, 597 S.E.2d at 112. The evidence established that Barrett knew her daughter was jealous of the infant and had a "propensity for attempting to injure [him]." Id. at 184, 597 S.E.2d at 111. Barrett also knew her daughter loved to play in the bathtub, was able to climb in and operate the tub's faucets by herself, and had previously pulled the infant, "head first," into the bathtub with her. Id. at 185, 597 S.E.2d at 111-12. Finally, Barrett acknowledged that the sound of water running in the bathroom was audible from other parts of the home. Id.

The evening before the infant drowned, Barrett stayed out all night drinking beer. Id. at 185, 597 S.E.2d at 112. She drove home at 6:00 a.m. and acknowledged that she was still intoxicated enough at that time to have been arrested for driving under the influence. Id. Sometime that morning, while "still intoxicated as well as tired," Barrett fell asleep at a time when she "[knew] she was the only one left in the apartment to supervise the children." Id.

The Court held "the jury could have concluded that Barrett's conduct was willful and accompanied by acts of omission of a wanton nature showing a reckless or indifferent disregard of the life and health of both children. . . . What we have here is the story of a disaster just waiting to happen . . . ." Id. at 185-86, 597 S.E.2d at 112. The Supreme Court distinguished its decision affirming the conviction in Barrett from our earlier decision reversing a conviction in Ellis, stating Barrett's neglect was willful whereas Ellis's neglect was inadvertent. Id. at 186 n.8, 597 S.E.2d at 112 n.8.

Ellis involved a mother who turned on a burner of her apartment's gas stove to light a cigarette and then left the apartment to visit a friend in a nearby apartment while her two young children were napping. Ellis, 29 Va. App. at 551-52, 513 S.E.2d at 455. A fire broke out in Ellis's apartment shortly after she left. Id. at 552-53, 513 S.E.2d at 455. In reversing Ellis's conviction, we reasoned as follows:

> While appellant . . . purposefully and intentionally left her apartment . . . , the intent which is relevant to our determination of "bad purpose" does not relate simply to why she left the apartment. Rather, it relates to the degree to which she was aware of the danger when leaving her children unattended. Here, no evidence establishes that . . . she acted with knowledge or consciousness that her children would be injured as a likely result of her departure to visit a neighbor for a short period of time in another residential building.
>
> [Further, the evidence] fails to show that appellant left the apartment knowing the burner was on and in conscious disregard of the likely ignition of a grease fire that would ultimately endanger the lives of her children. . . .
>
> . . . [I]nattention and inadvertence have not been heretofore equated with actions taken willfully, thus making them subject to criminal penalty. Similarly, appellant's inability to "see anything wrong with what she had done by going outside and leaving the children alone in the apartment," while clearly misguided, is reflective of simple negligence, not criminal conduct.

Id. at 555-56, 513 S.E.2d at 457 (citations omitted).

We hold that appellant's conduct was more akin to Ellis's than Barrett's because the evidence failed to show appellant "was [or should have been] aware of the danger" that resulted from her acts. See Ellis, 29 Va. App. at 555, 513 S.E.2d at 457; see also Barrett, 268 Va. at 184, 597 S.E.2d at 111 (requiring proof that defendant "'[knew], or [was] charged with the knowledge of, the probable results of [her] acts'" (quoting Cable, 243 Va. at 240, 415 S.E.2d at 220)); Mangano v. Commonwealth, 44 Va. App. 210, 215, 604 S.E.2d 118, 120 (2004) (noting "distinguishing feature between Barrett and Ellis is an awareness of the likely danger in the

defendant's conduct"). No evidence established that appellant, unlike Barrett, failed to take steps to prevent the recurrence of a prior event that had placed her children at risk of harm. As appellant argued at trial, the record, even viewed in the light most favorable to the Commonwealth, contains little information surrounding the previous occasion on which appellant's children left the residence on their own and had to be returned by a neighbor. The record leaves open the reasonable hypothesis that, on that prior occasion, appellant had failed adequately to secure the door to the residence and that, on this subsequent occasion, she was entitled to conclude that engaging the door's lock and chain would keep her children from leaving the trailer. The fact that appellant's actions did not eliminate all risk to her children was insufficient to prove criminal negligence. As we recognized in Ellis, "willful maltreatment of a child requires 'something worse than good intentions coupled with bad judgment.'" 29 Va. App. at 556, 513 S.E.2d at 457 (quoting Mullen v. United States, 263 F.2d 275, 276 (D.C. Cir. 1958)). Compare Kelly v. Commonwealth, 42 Va. App. 347, 355-57, 592 S.E.2d 353, 357-58 (2004) (upholding conviction where defendant left twenty-one-month-old child strapped in car seat for seven hours, resulting in child's death, and evidence established that, on three previous occasions over period of years, neighbors had to alert defendant to fact that a child had been left locked inside one of defendant's vehicles).

Further, no evidence indicates appellant was under the influence of any intoxicants that caused her to sleep so soundly she did not know the children had left the residence. Appellant admitted she had a "significant" cocaine problem as of the date of trial on February 3, 2004, but no evidence established the degree of her cocaine use in September 2003. Appellant testified that prior to the children's escape on September 29, 2003, she had last used cocaine three days earlier and that, at the time of the children's escape, she was not under the influence of any intoxicants that diminished her awareness of the children's whereabouts or her ability to care for

them. The fact that the trial court made a general finding that appellant did not give credible testimony does not provide affirmative evidence that her functioning was, in fact, impaired on the morning in question, either because she was under the influence of cocaine or some other intoxicant or was unusually tired because of their earlier use. See, e.g., Tarpley v. Commonwealth, 261 Va. 251, 256-57, 542 S.E.2d 761, 764 (2001).

In the absence of evidence either (1) that, on some prior occasion, the two- and five-year-old children opened a locked and chained door in order to leave the residence or (2) that their mother was under the influence of drugs or other intoxicants causing her to sleep so soundly or for so long that she was unable to render adequate supervision, we are unwilling to conclude that a mother who naps with her children but fails to awaken when the children arise and go out to play in 70 degree weather is guilty of criminal negligence, whether or not she is aware that she is a particularly sound sleeper. Appellant's napping during the day while her partially clad five- and two-year-old children managed to open the front door and go out to play in the neighborhood amounted, *at most*, to bad judgment or simple negligence, not the criminal negligence necessary to support a conviction under Code § 18.2-371.1(B)(1).

For these reasons, we hold the evidence was insufficient to prove criminal negligence. We reverse and dismiss appellant's convictions for violating Code § 18.2-371.1(B)(1).

Reversed and dismissed.

Frank, J., dissenting.

I respectfully dissent because I believe this case is based solely on a standard of review analysis.

When considering on appeal the sufficiency of the evidence presented below, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002); see also McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (*en banc*). Under this standard, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Myers v. Commonwealth, 43 Va. App. 113, 118, 596 S.E.2d 536, 538 (2004) (citation omitted and emphasis in original). It asks instead whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original). Thus, we do not "substitute our judgment for that of the trier of fact" even if our opinion were to differ. Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002).

Unlike the majority, I believe the facts before us are more akin to Barrett v. Commonwealth, 268 Va. 170, 597 S.E.2d 104 (2004). In Barrett, the Supreme Court affirmed a conviction for child neglect in violation of Code § 18.2-371.1(A). The accused returned to her apartment after a night of drinking and fell asleep with her two young children in her sole care. Id. at 180, 597 S.E.2d at 109. Six hours later, her boyfriend returned and found the defendant still asleep and the youngest child drowned in the bathtub. Id. Barrett contended that "[w]hile [her] falling asleep was not without remorse and blame, it does not rise to the level of a willful act or omission committed with a bad intent, a bad purpose, or a conscious disregard for human

- 12 -

life." Id. at 184, 597 S.E.2d at 111.  The Court disagreed, stressing that Barrett would have the Court focus on her "act of falling asleep" in a vacuum when it must be viewed in light of all the circumstances preceding and surrounding the tragic events.  Id.  When so viewed, the circumstances show beyond all reasonable doubt that Barrett was guilty of more than "ordinary negligence."  Id.  She was fully aware of the older child's earlier attempt to injure the baby, but recklessly disregarded those warning symptoms in neglect of her duty to protect both children. Id.

Here, as in Barrett, the trial court found that appellant was in such a deep sleep that "she can't be awakened to check on her children or know where her children are."  Noting L.J.'s physical disabilities and S.'s young age, the court concluded that appellant omitted to take proper care of her children and that this omission was "so great that it was wanton and likely to cause injury of which would make it not improbable that injury would be occasioned."

There is evidence in the record to support the trial court's finding.  Specifically, I note L.J.'s inability to hear sounds that a non-impaired child would recognize as signs of danger.  At oral argument, appellant acknowledged that parents of children with special needs are confronted with a heightened responsibility of supervising those children.  Yet, while fully aware of her children's limitations, appellant, a self-admitted drug user, fell into such a coma-like sleep for several hours during the daytime that she was unable to respond to banging on her door and a barking dog.  Appellant did not waken by the disruption of her children getting out of her bed, and she did not respond to S.'s cries for his "mommy."  Further, fecal matter on S.'s legs, having had time to dry, indicates that the children had been left unattended for a substantial period of time.

Appellant's willful misconduct was going to sleep in the middle of the morning, staying asleep, and leaving two small children unattended in the process.  By failing to supervise her

children, appellant "created a situation 'reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned, and [she knew], or [was] charged with the knowledge of, the probable results of [her] acts.'" Barrett, 268 Va. at 184, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).

I am not suggesting parents with young or disabled children cannot take a nap or sleep. Such was not appellant's willful omission. See id. (refusing to focus on appellant's "act of falling asleep" in a vacuum).

A reasonable fact finder could infer, based on common knowledge, that there were inherent dangers in leaving the young children unattended during the day. See Commonwealth v. Duncan, 267 Va. 377, 386, 593 S.E.2d 210, 215 (2004) (noting that the fact finder could infer, by common knowledge, the dangers "inherent in such a situation"). The record supports the trial court's conclusion that, in view of the special vulnerability of her children, appellant exposed her children to a substantial risk of serious injury or death by falling into such a deep and inert sleep. Accordingly, I would affirm the convictions.[2]

---

[2] This same panel recently reversed Frey v. Commonwealth, Record No. 1106-04-2 (Va. Ct. App. April 19, 2005), under similar facts, but distinguishable issues. In Frey, appellant was convicted of willful neglect of her child pursuant to Code § 18.2-371.1(B)(1) after her child wandered away from home in the early morning. There, the parties agreed that by installing and using a deadbolt, appellant took adequate steps to contain and supervise her child, who had wandered off in the past. The issue was whether appellant was negligent in not checking the security of the lock after her roommate came home at 5:00 a.m. and disengaged the deadbolt. We found that appellant's actions in not re-checking the lock did not amount to criminal negligence. Here, the issue is not whether appellant took appropriate actions to secure the trailer, but rather it is that appellant went to sleep in the middle of the morning and remained asleep in a comatose-like state, oblivious to her surroundings and the needs of her vulnerable children.