PRESENT: Hassell, C.J., Lacy, Keenan, Kinser, Lemons, and Agee, JJ., and Stephenson, S.J.

SAMANTHA LYNN MORRIS

OPINION BY
v. Record No. 052654     SENIOR JUSTICE ROSCOE B. STEPHENSON, JR.
                                        November 3, 2006
COMMONWEALTH OF VIRGINIA


FROM THE COURT OF APPEALS OF VIRGINIA

The sole issue in this appeal is whether the evidence is sufficient to support a mother's conviction of felonious child neglect in violation of Code § 18.2-371.1(B).  The accused mother, Samantha Lynn Morris, contends that the evidence is insufficient, as a matter of law, because it did not prove that she willfully failed to provide care for her two children in a manner so gross, wanton, and culpable as to show a reckless disregard for their lives.

I

In a bench trial, Morris was found guilty of two charges of felony child neglect.  The court sentenced Morris to two years' imprisonment, with one year and nine months suspended, on each offense and directed that the sentences run concurrently.

In an unpublished opinion, a three-judge panel of the Court of Appeals reversed the convictions and dismissed the charges.  Thereafter, the Court of Appeals granted the Commonwealth's petition for a rehearing en banc and affirmed the convictions.

Morris v. Commonwealth, 47 Va. App. 34, 37, 622 S.E.2d 243, 244 (2005).  We awarded Morris this appeal.

II

In considering whether evidence is sufficient to sustain a criminal conviction, we view the evidence in the light most favorable to the prevailing party at trial and grant to it all reasonable inferences fairly deducible from that evidence. Jackson v. Commonwealth, 267 Va. 178, 204, 590 S.E.2d 520, 535 (2004).  When thus viewed in the light most favorable to the Commonwealth, the evidence established that, as of September 29, 2003, Morris had two children, both boys, L.J., age five-and-a-half years, and S., age two-and-a-half years.  L.J. had hearing and speech impairments and wore hearing aids.

On the morning of September 29, 2003, Richard Goodin, a family support worker at L.J.'s elementary school, learned that L.J. was not in school.  When Goodin was unable to contact Morris by telephone, he went to the trailer court where Morris lived.  Goodin arrived about 9:30 a.m. and knocked on Morris' door.  Despite knocking "for a significant amount of time," Goodin raised no response, except for a dog's barking, and left Morris' trailer.

About 11:15 a.m. that day, Goodin returned to Morris' residence and again raised no response to his knocking.  Goodin looked around the neighborhood and saw two children playing in

2

the nearby woods.  One child appeared to be between four and six years old, and the other child, who was naked, appeared to be between two and three years old.[*]  The children were "interacting and laughing" and seemed to be "having a good time."  The younger child was "fairly dirty" and had a runny nose and dried fecal matter on his leg.

Goodin knocked on several doors in the neighborhood, hoping to ascertain where the children lived.  When he got no response from any residences, Goodin called Child Protective Services and 911.  While waiting for the police to arrive, Goodin decided to take custody of the younger child because the child had started to climb on an automobile that appeared to be awaiting repair.  Goodin thought the area was "dangerous" due to the presence of the car as well as engine blocks and a weight lifting bench with weights on it, all of which were "closer to the road."

Two police officers arrived within five to 15 minutes after Goodin's call.  Officer Raleigh Anderson knocked on the doors of several residences, including Morris' trailer, but received no response.  When he knocked on the door to Morris' trailer, however, the door came open.  Anderson yelled, "[C]ounty police," several times, and, when no one responded, he "pulled the door closed" and continued his search for the children's home.

---

[*] The temperature was approximately 70 degrees Fahrenheit.

3

In the meantime, Corporal James Larkin approached L.J.  Due to L.J.'s hearing and speech difficulties, however, Larkin was unable to learn L.J.'s address.  When Larkin asked L.J. if the younger child was his brother, L.J. "kept saying no," so he and L.J. walked away to look for L.J.'s home.

As Larkin and L.J. walked away, the younger child became "pretty visibly upset," "started calling mommy," and ran toward a particular trailer.  Anderson followed the child to the trailer.  The child pushed the door open and ran into the trailer and toward one of the rear bedrooms, still "calling mommy."  Anderson followed and, in the darkness, saw a man and a woman lying on the bedroom floor.  Upon seeing them, Anderson stopped and "announced county police a couple of times."  When he received no response, Anderson backed out of the trailer.

Anderson then began "pounding on the door" with his fist while "announcing county police."  Ultimately, the man came to the door.  When Anderson asked about the children, the man went to get the woman.  The woman came into the living room, identified herself as the children's aunt, and said that she was just watching the children for her sister, Samantha Morris.  The younger child, however, kept calling the woman, "Mommy."  When the woman asked Anderson where the five-year-old child was, Anderson radioed Larkin that he had found the children's residence, and Larkin brought L.J. to the residence.

4

The woman continued to maintain that the children were her nephews until the children's grandmother arrived on the scene. After the two women had some private conversation, the woman admitted that she was the children's mother and that her name was Samantha Morris.  Morris said she had given the false information because she was afraid that there were outstanding warrants for her arrest.  When Morris was asked to explain why the children were outside unattended, she said that she had been sleeping.  She also said that the children had gotten out of the trailer on another occasion "a few days prior" and that "somebody in the [neighborhood] had to return them home." Thereupon, Larkin arrested Morris for the instant offenses.

At trial, Morris testified that L.J. had "great hearing loss . . . in his left ear" and a lesser hearing loss in his right ear and that he had lost one of his hearing aids.  She explained that L.J. also had chronic asthma and a painful condition in his left leg.  She said that, because of these conditions, L.J. "had been up the couple nights before" September 29, which caused him to "be tired in the mornings." When L.J. awoke on September 29, he told Morris that he did not feel well, so Morris decided to let him stay home from school.

According to Morris, she and her two children were sitting on the couch watching television when the younger child appeared to be getting sleepy.  She asked L.J. if he wanted to take a

5

nap, and he said, "[S]ure." Morris closed the curtains, turned

on a fan, and "locked the chain lock on the door and the door

knob lock" of the trailer. She and the children "went in and

all laid down in the bed." Morris then fell asleep. She later

was awakened when she heard someone yelling, "Albemarle County

Police."

Morris admitted that, at the time of trial on February 3,

2004, she had a "significant substance abuse problem." However,

she denied being under the influence of drugs or alcohol on

September 29, 2003. She further stated that she had last used

drugs "[a]bout three days prior" to that date.

III

Code § 18.2-371.1(B)(1) provides as follows:

> Any parent, guardian, or other person responsible
> for the care of a child under the age of 18 whose
> willful act or omission in the care of such child was
> so gross, wanton and culpable as to show a reckless
> disregard for human life shall be guilty of a Class 6
> felony.

In explaining his reasons for finding Morris guilty of felonious

child neglect under the statute, the trial judge stated the

following:

> [T]he [question] the Court's confronted with is . . .
> did she omit proper care of her children and [was]
> this omission, this negligence, . . . so great that it
> was wanton and likely to cause injury or which would
> make it not improbable that injury would be
> occasioned[.] [T]he facts that I've got are that
> somehow, she was so sound asleep, she was so deep in
> sleep that nothing would arouse her to alert her that

6

her children were getting up and going outside and were outside for forty-five (45) minutes and that there were knocks at the door by Mr. Goodin . . . . There were knocks at the door by the police. There was shouting and whatever sleep she was in, it was so sound, it almost would require an earthquake to wake her up, and going to sleep in that fashion, and whatever caused that, with a five-year-old who I've heard is speech impaired, hearing impaired, had leg pain and a limp with chronic asthma and a two-year-old who can't communicate. So we've got kids that are wandering outside who cannot communicate, cannot tell anybody who they are, there are no other responsible adults around, the two-year[-]old's unclothed, Mr. Goodin says he finds them in a dangerous area and he searches for the parents, and she's so asleep that she can't be awakened to check on her children or know where her children are, and I think that meets the definition, coupled with what—that the neighbors [previously] brought the children back, that it was seventy (70) degrees, that she had awakened that morning, but couldn't remain alert enough to omit being negligent in caring for her children or . . . to be negligent in the omission of the care of her children, so I find her guilty . . . . [A]nd I add to that her credibility about not even being their mother. I think that factors in, too, in her omission in the care of her kids.

As previously stated, we must view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial. Jackson, 267 Va. at 204, 590 S.E.2d at 535. Additionally, the trial court's judgment is presumed to be correct and will be reversed only if it is plainly wrong or without evidence to support it. Id.; Code § 8.01-680. Thus, we do not substitute our judgment for that of the fact finder even

7

if our opinion were to differ. Phan v. Commonwealth, 258 Va. 506, 511, 521 S.E.2d 282, 284 (1999).

In order for a person to be convicted of felony child neglect, the Commonwealth must prove beyond a reasonable doubt that the accused committed a "willful act or omission in the care" of a child. The Commonwealth also must prove that the act or omission is "so gross, wanton and culpable as to show a reckless disregard for human life." Code § 18.2-371.1(B)(1).

We have said that "[t]he term 'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004). We have also said that the term "willful," as used in the statute, refers to conduct that "must be knowing or intentional, rather than accidental, and [undertaken] without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose. . . . Thus, the term 'willful' . . . contemplates an intentional, purposeful act or omission." Commonwealth v. Duncan, 267 Va. 377, 384-85, 593 S.E.2d 210, 214-15 (2004) (citations omitted). Accord Barrett, 268 Va. at 183, 597 S.E.2d at 111.

Additionally, we have stated that the term "gross, wanton and culpable" describes conduct, whether by action or omission.

8

> The word "gross" means "aggravated or increased
> negligence" while the word "culpable" means "deserving
> of blame or censure." Bell [v. Commonwealth, 170 Va.
> 597, 611, 195 S.E. 675, 681 (1938)]. " 'Gross
> negligence' is culpable or criminal when accompanied
> by acts of commission or omission of a wanton or
> willful nature, showing a reckless or indifferent
> disregard of the rights of others, under circumstances
> reasonably calculated to produce injury, or which make
> it not improbable that injury will be occasioned, and
> the offender knows, or is charged with the knowledge
> of, the probable result of his acts." Id. at 611-12,
> 195 S.E. at 681.

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).

In Barrett, a ten-month-old infant was drowned when he was placed in a bathtub by his two-year-old sister. Barrett, the children's mother, was charged with felony neglect of her daughter under Code § 18.2-371.1(B). 268 Va. at 173-74, 597 S.E.2d at 105. The evidence established that Barrett knew that her daughter was jealous of her infant brother and had a "propensity for attempting to injure [him]." Id. at 184, 597 S.E.2d at 111. Barrett also knew that her daughter liked to play in the bathtub and was able to operate the tub's faucets by herself. In addition, Barrett knew that, shortly before the infant's death, when she had left her daughter unattended in the bathtub, her daughter had pulled the infant "head first" into the bathtub. Id. at 185, 597 S.E.2d at 111-12.

The evening before the tragic incident, Barrett was out all night drinking beer. She admitted that, when she drove her car

9

home at 6:00 a.m., she was still intoxicated enough to have been arrested for driving under the influence. Later that morning, while Barrett was tired and still intoxicated, she fell asleep at a time when she "[knew] she was the only one left in the apartment to supervise the children." Id. at 185, 597 S.E.2d at 112.

We affirmed Barrett's conviction of felony child neglect under Code § 18.2-371.1(B)(1). Id. at 186, 597 S.E.2d at 112. We concluded that the evidence revealed "the story of a disaster just waiting to happen, a disaster any reasonable person would consider likely to result in injury to [Barrett's children]." Id. at 185, 597 S.E.2d at 112. Yet, Barrett, with abundant knowledge of the substantial risk of serious injury to her children, failed in her duty to protect them. Id. at 185-86, 597 S.E.2d at 112.

IV

The Commonwealth contends and the Court of Appeals' majority held that the present case is governed by our decision in Barrett. We disagree.

In Barrett, the mother had knowledge of many facts that should have forewarned her that an injury was likely to occur. She also was tired and intoxicated from a night of drinking beer and totally unable to protect her children from a tragedy. In the present case, Morris had no reason to believe her children

10

would be in any danger while she was asleep with them, particularly after she had double-locked the trailer door. Contrary to the Commonwealth's assertion, there was no evidence that Morris was under the influence of drugs or alcohol at the time she and the children went to sleep. While Morris admitted that she had a substance abuse problem at the time of trial and had used drugs three days prior to September 29, there was no evidence presented to indicate that Morris was under the influence of alcohol or drugs on that day. She was also in the presence of two police officers for a lengthy interview that same day, and the officers did not note that Morris was under the influence. It is mere speculation, therefore, to say that Morris' deep sleep was likely drug or alcohol induced.

V

When the evidence is viewed in the light most favorable to the Commonwealth and considered in light of all the circumstances preceding and surrounding the events of September 29, 2003, we conclude, as a matter of law, that Morris' conduct was not a willful act or omission in the care of her children that was so gross, wanton, and culpable as to show a reckless disregard for their lives. Therefore, we hold that the evidence is insufficient to sustain Morris' convictions. Accordingly, we will reverse the judgment of the Court of Appeals and dismiss the charges against Morris.

11

JUSTICE KINSER, with whom JUSTICE KEENAN and JUSTICE LEMONS join, dissenting.

I respectfully disagree with the majority's conclusion that the evidence was insufficient to sustain Morris' two convictions for felonious child neglect in violation of Code § 18.2-371.1(B) and accordingly would affirm the judgment of the Court of Appeals.

When the sufficiency of the evidence is challenged on appeal, this Court is required to view the evidence in the light most favorable to the prevailing party at trial, in this case the Commonwealth, and accord to that party the benefit of all reasonable inferences fairly deducible from the evidence. Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005); Jackson v. Commonwealth, 267 Va. 178, 204, 590 S.E.2d 520, 535 (2004); Zimmerman v. Commonwealth, 266 Va. 384, 386, 585 S.E.2d 538, 539 (2003). "Additionally, this Court has the duty to review the evidence that tends to support the conviction . . . ." Correll v. Commonwealth, 269 Va. 3, 12, 607 S.E.2d 119, 124 (2005). "The judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is 'plainly wrong or without evidence to support it.'" Viney, 269 Va. at 299, 609 S.E.2d at 28 (quoting Code § 8.01-680). Although the majority cites these well-established principles of

12

appellate review and acknowledges that this Court cannot substitute its judgment for that of the fact finder, I believe that the majority fails to consider the evidence that supports the convictions in the light most favorable to the Commonwealth but, instead, makes its own credibility determinations and substitutes its view of the facts for the judgment of the trial court.

The majority contrasts the facts in the case at bar with those in Barrett v. Commonwealth, 268 Va. 170, 597 S.E.2d 104 (2004), by focusing on Barrett's knowledge of her two children's prior behavior that should have forewarned Barrett about the likelihood of injury to one or both of her children and her state of fatigue resulting from intoxication on the evening before the incident at issue in that case. The majority asserts that, unlike Barrett, "Morris had no reason to believe her children would be in any danger while she was asleep." Viewing the evidence in the light most favorable to the Commonwealth, I disagree.

Morris was indeed on notice about her children's propensity to wander from the trailer without her knowledge or any adult supervision. Morris admitted to one of the police officers that a similar episode had occurred "a few days prior to [the incident at issue], [and] that somebody in the trailer park had to return [the children] home." Despite this notice, Morris

13

fell into such a coma-like sleep during the daytime that she could not be aroused for a period of more than two hours by repeated banging on her door and a barking dog. She was sleeping so soundly that she did not realize her children had gotten out of the bed, unlocked the chain lock on the door and the doorknob lock, both of which Morris allegedly had locked, and left the trailer. She did not hear the police officer's entry into the trailer or respond to his calls announcing he was a police officer. Even more disturbing is the fact Morris was in such a deep sleep that she did not hear her younger child calling for "mommy" when he ran back into the trailer.

Despite the overwhelming evidence about Morris' coma-like sleep on the day in question, the majority concludes there was no evidence presented to show that Morris was under the influence of drugs or alcohol when her children wandered out of the trailer. At trial, Morris acknowledged, however, that she had used cocaine about three days prior to the incident, and when asked if she has a significant substance abuse problem, Morris answered, "I do." Furthermore, when questioned about the nature of her substance abuse problem, she replied, "I was using cocaine." Yet, the majority concludes that "[i]t is mere speculation . . . to say that Morris' sleep was likely drug or alcohol induced."

14

The majority apparently chooses to believe Morris' testimony denying that she was under the influence of drugs on the day in question despite the fact Morris lied about being the children's mother. When the police officers questioned Morris at her trailer, she initially identified herself as Billie Jean Lloyd and stated that the children were her nephews. After Morris' mother arrived at the trailer, Morris told the police that the children were hers but still used the name, Billie Jean Lloyd. Only after further conversations with her mother did Morris admit her true identity. Morris testified at trial that she gave false information to the police officers because she thought there was an outstanding warrant for her arrest.

Given Morris' greater concern about an arrest warrant than the condition of her children or their whereabouts, and her lying to conceal her identity, the fact finder was entitled to give little weight to Morris' testimony. In fact, the trial court noted her lack of credibility, evidenced by her denying that she was the children's mother. "The factfinder need not believe an accused's explanation and, if that explanation is not believed, may infer that the accused is lying to conceal [her] guilt." Phan v. Commonwealth, 258 Va. 506, 511, 521 S.E.2d 282, 284 (1999). Moreover, this Court is not free to re-weigh the evidence. See Virginian Ry. Co. v. Bell, 118 Va. 492, 495, 87 S.E. 570, 572 (1916)(appellate court "cannot consider the weight

15

of the evidence or the credibility of the witnesses"). "We must review the evidence in this case not with respect to what action we might have taken, but as to whether the evidence justified the trial judge, as a trier of the facts, in finding defendant guilty." Avent v. Commonwealth, 209 Va. 474, 477, 164 S.E.2d 655, 657 (1968).

The saga does not end here. The older child had certain disabilities that caused him to be unable to respond to the police officer's inquiries about where he lived. The child was not even able to give his name to the officer. Furthermore, the condition of the younger child, in particular his state of nakedness with dried fecal matter on his legs and chafing on his posterior, demonstrates that the child had been left unattended for a significant period of time. In fact, because of the child's condition and the dangerous automobile parts around which the children were playing, the family support worker from the elementary school was so concerned that he called child protective services and then "9-1-1."

As this Court stated in Barrett, we must view "all the circumstances preceding and surrounding" the incident on the day in question. 268 at 184, 597 S.E.2d at 111. In light of the older child's disabilities, the young age of the other child, Morris' knowledge of the prior incident when her children wandered from the trailer, and her coma-like sleep on the day in

16

question, I conclude that Morris "created a situation 'reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned, and [she knew], or [was] charged with the knowledge of, the probable results of [her] acts." Id. at 184, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)). Thus, I reach the same conclusion as this Court did in Barrett. The fact finder could have reasonably concluded that Morris' "conduct was willful and accompanied by acts of omission of a wanton nature showing a reckless or indifferent disregard of the life and health of both children." Id. at 185, 597 S.E.2d at 112.

For these reasons, I respectfully dissent and would affirm the judgment of the Court of Appeals.