COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Felton, Judges Elder, Frank, Humphreys, Kelsey, McClanahan, Haley, Petty,
          Beales, Powell and Alston
Argued at Richmond, Virginia


ELIZABETH POLLARD NOAKES
                                                                OPINION BY
v.       Record No. 0295-08-2                          JUDGE RANDOLPH A. BEALES
                                                              AUGUST 18, 2009
COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Herbert C. Gill, Jr., Judge

James T. Maloney (Maloney & David, P.L.C., on brief), for
appellant.

Joshua M. Didlake, Assistant Attorney General (William C. Mims,
Attorney General, on brief), for appellee.


        Elizabeth Noakes (appellant) was convicted after a bench trial of involuntary

manslaughter in the death of fifteen-month-old Noah Colassco (Noah).  On appeal, appellant

argues that the Commonwealth presented insufficient evidence that she acted with criminal

negligence, an essential element of involuntary manslaughter.  A divided panel of this Court

disagreed with appellant's argument, holding that the evidence was sufficient to prove criminal

negligence.  See Noakes v. Commonwealth, No. 0295-08-2, 2009 Va. App. LEXIS 12 (Va. Ct.

App. Jan. 13, 2009).  We granted appellant's petition for rehearing *en banc* and stayed the

mandate of the panel's decision.  On rehearing en banc, we now lift the stay and affirm

appellant's involuntary manslaughter conviction for the reasons stated below.

I.  BACKGROUND

On October 18, 2006, Noah was placed in the care of appellant, who ran a daycare business out of her home.  Appellant placed Noah and at least one other child in cribs located in a spare bedroom.[1]  The surface of the crib was raised from the floor by four legs, which continued upward until they met hard plastic supports at the top of each corner.  The four "walls" of the crib were made of a mesh material.  The rectangular crib was placed in a corner of a loft bedroom, at the intersection of the bedroom's back wall and the right side wall; therefore, one long side of the crib and one short side of the crib abutted those walls.  The other short side of Noah's crib was situated within inches of another crib, leaving the remaining long side ("the front side") as the only side of the crib exposed to the remainder of the bedroom.

Appellant put Noah down for a nap at around noon, but Noah refused to sleep.  Noah's refusal to sleep was a common occurrence while he was in appellant's care.  Appellant had tried several "traditional" methods to get Noah to sleep, but those were unsuccessful.  Appellant determined that the source of the problem was Noah's ability and desire to stand in his crib.

In an attempt to prevent Noah from standing up, appellant devised a plan to cover the top of the crib with cardboard and fabric and to place a thirty-three-pound, folded-up dog crate on top of the cardboard.  In implementing her plan, the cardboard and fabric covered the entire top of the crib, and the dog crate covered half of the width of the crib.  Appellant placed the dog crate so that it covered the front side of the crib, where Noah usually stood.

Before leaving the dog crate there with Noah inside the crib, appellant removed Noah from the crib, placed the crate on top of the crib, and then shook the crib to determine if the crate would easily fall down into the crib.  Satisfied that the dog crate would not fall into the crib,

_____

[1] A review of the videotape recorded hours after Noah's death reveals his crib was more analogous to a portable, "pack and play" variety than to a traditional wooden crib.

appellant removed the crate momentarily and placed Noah back in his crib. Appellant then placed the cardboard and fabric on top of the crib in such a way as to create an "overhang" to prevent Noah from sticking his fingers between the crib and the dog crate, thereby potentially injuring his fingers by getting them stuck in the dog crate. Appellant also considered the cardboard covering (padded with the fabric) to be a buffer should Noah hit his head while attempting to stand. Appellant then placed the dog crate on the crib, inspected the arrangement with Noah inside, and went back and forth periodically between her bedroom and the loft bedroom to monitor the situation and see if Noah had fallen asleep.

Despite these efforts, Noah still refused to sleep. Instead, he began pressing his face against the front side of the crib's mesh wall. To stop this behavior, appellant placed a large nylon toy against the front side of the crib, so that Noah could not look out of the crib. Doing this also essentially prevented appellant from being able to see into the crib to observe Noah. Appellant then assumed Noah went to sleep. She left the room at approximately 1:00 p.m.

Appellant did not return to the bedroom until approximately 3:30 p.m., when she attended to another child. She later told the police that she then left the room without checking on Noah.

A few minutes after 4:00 p.m., appellant returned to wake Noah from his nap. She saw Noah standing in the crib with his head, neck, and hands over the side of the crib. His neck was wedged between the cardboard covering and the wall of the front side of the crib. The dog crate, still on top of the covering, held Noah in this position. As appellant demonstrated in the videotape recorded following Noah's death, Noah apparently lifted the cardboard covering enough to cause the dog crate to slide backwards. Noah apparently then stuck his head over the front-left corner and progressively slid along the front side's rail until he was wedged under the thirty-three-pound dog crate near the center of the front side. Noah became trapped as a result.

Noah was unconscious, and his face was blue. Appellant unsuccessfully attempted CPR while she was on the phone with the emergency operator. The responding paramedics pronounced Noah dead at appellant's home.

The medical examiner determined that Noah died from asphyxiation; specifically, the suppression of the blood vessels in his neck had constricted the flow of oxygen to his brain. The medical examiner could not determine a time of death, but indicated that this type of asphyxiation typically would have taken "minutes and not hours."

At the conclusion of appellant's trial, the trial court found that the Commonwealth had sufficiently proven appellant's criminal negligence, commenting that appellant's "conduct was arrogantly reckless, merciless and inhumane, recklessly disregarding Noah's safety or [the] consequences of her actions, being indifferent as to whether the harm would result." The court found appellant guilty of involuntary manslaughter, and this appeal followed.

II. ANALYSIS

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663, 588 S.E.2d at 387 (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). See also Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. Consequently, our review of the sufficiency of the evidence on appeal here involves an assessment of "'whether the evidence adduced at trial could support *any* rational determination of guilt beyond a reasonable doubt.'" Coleman v. Commonwealth, 52 Va. App. 19, 23, 660 S.E.2d 687, 689 (2008) (quoting United States v. Powell, 469 U.S. 57, 67 (1984)) (emphasis added).

While involuntary manslaughter is a Class 5 felony, it is not statutorily defined. See Code § 18.2-36. In a recent opinion, our Supreme Court explained the elements of involuntary manslaughter accordingly:

> [T]he crime of common law involuntary manslaughter has two elements: 1) the accidental killing of a person, contrary to the intention of the parties; and 2) the death occurs in the defendant's prosecution of an unlawful but not felonious act, or in the defendant's improper performance of a lawful act. Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992); Dowden v. Commonwealth, 260 Va. 459, 470, 536 S.E.2d 437, 443 (2000); Gooden v. Commonwealth, 226 Va. 565, 571, 311 S.E.2d 780, 784 (1984). To constitute involuntary manslaughter, the "improper" performance of a lawful act must amount to an unlawful commission of that lawful act, manifesting criminal negligence. Cable, 243 Va. at 240, 415 S.E.2d at 220; Kirk v. Commonwealth, 186 Va. 839, 847, 44 S.E.2d 409, 413 (1947).

West v. Director, Dep't of Corr., 273 Va. 56, 63-64, 639 S.E.2d 190, 195 (2007).

Here, the trial court found appellant acted with criminal negligence and was guilty of involuntary manslaughter. The trial court's findings are examined on appeal by reviewing the totality of the evidence. See Commonwealth v. Duncan, 267 Va. 377, 385, 593 S.E.2d 210, 215 (2004). In reviewing the sufficiency of the evidence supporting the verdict in this case, our analysis is guided particularly by two principles.

First, although "'the application of the distinctions between the[] degrees of negligence is frequently difficult to apply,'" Tubman v. Commonwealth, 3 Va. App. 267, 273, 348 S.E.2d 871,

874 (1986) (quoting <u>Town of Big Stone Gap v. Johnson</u>, 184 Va. 375, 379, 35 S.E.2d 71, 73 (1945)), such determinations "'only become questions of law to be determined by [an appellate] court [rather than by the factfinder], when reasonable minds could not differ,'" <u>Forbes v. Commonwealth</u>, 27 Va. App. 304, 309, 498 S.E.2d 457, 459 (1998) (quoting <u>Tubman</u>, 3 Va. App. at 273-74, 348 S.E.2d at 875). This principle is based on the long established standard of review that the factfinding of a lower court receives "the highest degree of appellate deference." <u>Thomas v. Commonwealth</u>, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006). Under this standard of review, the possibility that another rational factfinder *could* have found differently does not mean that *no* rational factfinder would have found appellant was criminally negligent here. Only in the event that reasonable minds would be compelled to agree that appellant's actions were not criminally culpable could we, as an appellate court, find the evidence of appellant's criminal negligence insufficient.

Second, in determining whether reckless conduct amounts to unlawful conduct sustaining a conviction for involuntary manslaughter, it is immaterial whether the unlawful act was unlawful in its inception – that is, an inherently unlawful act – or was a lawful act that then actually became unlawful by the way it was performed after it was begun. <u>See</u> <u>Gooden</u>, 226 Va. at 571, 311 S.E.2d at 784. As in <u>Gooden</u>, "[t]he present case is of the second category; conduct not inherently unlawful, but done without requisite caution, in an unlawful manner." <u>Id.</u> To prove a defendant's criminal negligence in relation to an otherwise lawful act, the Commonwealth must show that the performance was so improper as to constitute negligence so gross and culpable as to indicate a callous disregard of human life. <u>Beck v. Commonwealth</u>, 216 Va. 1, 4, 216 S.E.2d 8, 10 (1975) (citing <u>Goodman v. Commonwealth</u>, 153 Va. 943, 946, 151 S.E. 168, 169 (1930)).

> "The word 'gross' means 'aggravated or increased
> negligence' while the word 'culpable' means 'deserving of blame

or censure.' Bell [v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938)]. "'Gross negligence' is culpable or criminal when accompanied by acts of commission or omission of a wanton or willful nature,[2] showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts.' Id. at 611-12, 195 S.E. at 681."

Morris v. Commonwealth, 272 Va. 732, 739, 636 S.E.2d 436, 439-40 (2006) (quoting Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004)) (footnote added).

Appellant recognizes that there is support for a finding that she was grossly negligent, insofar as her act of placing the dog crate on Noah's crib constituted a "disregard of prudence" and would "shock [the] fair minded." See Ferguson v. Ferguson, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971) (stating gross negligence is "that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety" of another and "must be such a degree of negligence as would shock fair minded men although something less than willful recklessness"). However, she contends that she went to sufficient lengths to anticipate potential risks resulting from her "unconventional method" and to prevent those risks from becoming harmful. For instance, appellant noted that she shook the crate (after initially placing it on the crib while it was empty), to test the crate's tendency to fall from its perch over Noah; she padded the bottom of the crate with cardboard and fabric to safeguard Noah against injury to his head if he tried to stand; and she created an "overhang" with the cardboard to safeguard against Noah injuring his fingers in the holes of the crate. Appellant

---

[2] "Willful" conduct "must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose." Duncan, 267 Va. at 384, 593 S.E.2d at 214. "Wanton" conduct is "[m]arked by or manifesting arrogant recklessness of justice, of the rights or feelings of others" such as to be "merciless" and "inhumane." Forbes, 27 Va. App. at 310, 498 S.E.2d at 459; see Town of Big Stone Gap, 184 Va. at 379, 35 S.E.2d at 745.

claims that such precautionary measures demonstrate that she did not act with a callous disregard for the risks of death or serious injury that were likely to materialize. Therefore, appellant argues, while she may have been grossly negligent in her care of Noah, she was not criminally negligent. We disagree with appellant's contention that her recognition of some risks inherent in placing a thirty-three-pound dog crate on a crib militates against a finding of criminal negligence.

Appellant attempts to analogize the precautionary measures she took with the precautionary measures taken by the defendant in Forbes, whose involuntary manslaughter conviction was reversed on appeal. In Forbes, the defendant drove his vehicle into the rear end of a car stopped at the end of an interstate exit ramp, killing the victim. When the police arrived, the defendant indicated that he did not know where he was or how he had gotten there, that he was a diabetic, that he had occasionally "blacked-out" before due to this condition, and that it was possible the accident occurred due to a diabetic black-out while he was driving. Forbes, 27 Va. App. at 307, 498 S.E.2d at 458. In Forbes, this Court agreed with the defendant on appeal that, because he took precautionary measures recommended for diabetics and felt fine prior to driving, the evidence did not prove that he acted in a criminally negligent manner. Id. at 311, 498 S.E.2d at 460.

Appellant's case is readily distinguishable from Forbes. In Forbes, the precautionary measures taken by the defendant prior to driving – eating mints, drinking a glass of orange juice, waiting for fifteen minutes, and eating some more mints – were made pursuant to medical recommendations for diabetics experiencing a low blood sugar episode. Id. at 307-09, 498 S.E.2d at 458-59. As the defendant in Forbes substantially complied with these medical recommendations, the defendant neither "knew [n]or should have known that his conduct created a great risk reasonably calculated to produce injury." Id. at 313, 408 S.E.2d at 461. Here, in

contrast, the precautions taken by appellant were entirely of her own design – and were her own attempts to safeguard a heavy object, the thirty-three-pound dog crate, that was certainly not manufactured with the intention that it would be placed on a crib such as Noah's. Thus, the danger here was entirely of appellant's own creation: Noah would have never been endangered but for appellant's decision to place the thirty-three-pound dog crate on top of his crib. In short, appellant voluntarily created the danger for which she was held criminally culpable. See Cable, 243 Va. at 242, 415 S.E.2d at 221.

"Willful or wanton negligence involves a greater degree of negligence than gross negligence, particularly in the sense that in the former an actual or constructive consciousness of the danger involved is an essential ingredient of the act or omission." Griffin v. Shively, 227 Va. 317, 322, 315 S.E.2d 210, 213 (1984) (citations omitted). Here, the danger was that Noah would be harmed by appellant's placement of the dog crate atop his crib. This danger came in numerous forms, and appellant was aware of, or should have been aware of, far less dangerous alternatives to putting a thirty-three-pound collapsed dog crate over a young and active child in order to convince him to lie down and take a nap. Cf. Conrad v. Commonwealth, 31 Va. App. 113, 121-22, 521 S.E.2d 321, 325-26 (1999) (en banc) (holding that criminal negligence is judged under an objective standard). Notably, appellant testified at trial that she considered using only the cardboard or a net-like dome instead of the dog crate, but rejected those options because they would not have prevented Noah from standing up. So, appellant instead placed the dog crate on Noah's crib, despite her recognition – implicit in the precautions that she took – that this act could be dangerous. The trial court could reasonably have concluded that appellant recklessly disregarded Noah's safety by proceeding with her plan to prevent Noah from standing up by placing the dog crate on his crib.

Appellant contends that, because Noah's death resulted from a different risk of harm than she had foreseen, Noah's death was improbable; therefore, she claims that she was not criminally liable for his death. This contention is meritless. "It is not necessary that [appellant] foresaw the specific manner in which injury and death occurred." Gallimore v. Commonwealth, 15 Va. App. 288, 296, 422 S.E.2d 613, 618 (1992), aff'd, 246 Va. 441, 436 S.E.2d 421 (1993). Instead, "[i]t is sufficient that she reasonably could have foreseen that risk of death or serious harm might result from her actions." Id. (citing Blondel v. Hays, 241 Va. 467, 475, 403 S.E.2d 340, 345 (1991)). Here, given that appellant saw the need to protect this infant from some risks, appellant could have foreseen the harm that could and did befall Noah from putting a thirty-three-pound collapsed dog crate on top of his crib.

This is not a case where the defendant's *mere* inadvertence or inattentiveness created harm or the potential for harm. See, e.g., Ellis v. Commonwealth, 29 Va. App. 548, 555-56, 513 S.E.2d 453, 457 (1999) (finding that defendant was not criminally negligent because she was unaware she had left a kitchen burner on and, accordingly, did not consciously disregard the likely ignition of a grease fire that would ultimately endanger the lives of her children). Appellant affirmatively and knowingly created this danger to Noah, and then, despite her initial concerns, failed to check on him for several hours. Furthermore, the nature of Noah's death could not be considered improbable, given appellant was aware that Noah was tall enough to stand with his head above the crib side.[3] See Conrad, 31 Va. App. at 121-22, 521 S.E.2d at

---

[3] We reject appellant's related argument that Noah's ability to lift a dog crate thirty percent heavier than his own weight was an improbable feat constituting an intervening cause for his death, thus rendering appellant's placement of the dog crate on top of his crib something other than the probable cause of his death. However, Noah's lifting the dog crate, if this is how he became wedged between the crate and the crib, "was put into operation by [appellant's] negligent act[]" of placing the dog crate on top of Noah's crib. See O'Connell v. Commonwealth, 48 Va. App. 719, 728, 634 S.E.2d 379, 383 (2006). Therefore, Noah's actions were not an intervening cause.

325-26 (holding that criminal negligence "may be found to exist where the offender either knew or should have known the probable results of his acts"); Tubman, 3 Va. App. at 274, 348 S.E.2d at 875 (requiring the Commonwealth to prove that "a homicide was not improbable under all of the facts existing at the time, and that the knowledge of such facts should have had an influence on the conduct of the offender").

In addition, appellant knew that Noah wanted to stand in the crib. Consequently, she should have been especially concerned about how the child would attempt to move the items over his crib when he attempted – as young children do – to get around the constraints placed on him. "The same discernment and foresight that older people and experienced persons habitually employ in discovering dangers cannot be reasonably expected of children of tender years, and therefore the greater precaution should be taken where children are exposed to such dangers." Lynchburg Cotton Mills v. Stanley, 102 Va. 590, 594, 46 S.E. 908, 909 (1904). While appellant's "test" of the dog crate on the empty crib suggested to her that the crate would stay in place sufficiently enough not to fall in the crib, appellant was very aware that Noah was determined to stand in his crib. It was not at all improbable that a determined child of tender years would be able to get under the sides of this make-shift contraption, move the dog crate over a bit, and, in the process, as here, get his neck trapped so that he was asphyxiated. See id. ("That course of conduct which would be ordinary care when applied to persons of mature judgment and discretion might be gross, and even criminal, negligence toward children of tender years.").

Appellant's inattentiveness to the danger in which she placed Noah reinforces our holding that a rational factfinder could find appellant guilty of involuntary manslaughter. By appellant's own admission, she did not go in the bedroom where Noah was to check on him for approximately two and a half hours, from 1:00 p.m. until 3:30 p.m. When she checked on the

other child in the bedroom at 3:30 p.m., she did not even look in Noah's direction.[4]  Appellant said she simply assumed Noah was asleep.  Appellant then left Noah unattended from 3:30 p.m. until she found him unconscious and trapped between the crib and the cardboard/dog crate covering shortly after 4:00 p.m.  The medical examiner indicated that Noah's death from asphyxiation typically would have taken "minutes and not hours."  Leaving Noah unattended for even a half-hour, given the danger in which appellant placed Noah by setting a thirty-three-pound dog crate on top of his crib, was an unjustifiable risk.[5]

> Faced with a challenge to the sufficiency of the evidence, "we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them.  The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them."  Bradley v. Commonwealth, 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955).  In bench trials, the "trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise."  Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004) (citation omitted).

James v. Commonwealth, 53 Va. App. 671, 677, 674 S.E.2d 571, 574 (2009).

---

[4] She argued at trial and contends on appeal that, because she turned off an air conditioner situated close to the crib when she entered the room at 3:30, Noah was within her peripheral vision and she would have noticed anything amiss.  However, even if appellant could see Noah's crib in her peripheral vision, it does not necessarily follow that she would have noticed anything amiss.  The back side of Noah's crib was against a wall, and a large toy that appellant herself placed there covered the front side of the crib.  The short sides of the crib were obscured by a wall and another crib in close proximity to Noah's crib.  Furthermore, cardboard and the dog crate covered the top of the crib.  Accordingly, even if appellant could see Noah's crib peripherally, numerous impediments – many of her own making – blocked appellant's view of Noah and any efforts that he might have made to circumvent the dog crate that hindered his ability to stand up in the crib.

[5] Of course, appellant was a child care provider, providing child care in her home, so she especially should have known that the risk in which she placed this child in her charge was far too dangerous a risk to place him in and then leave him unattended.

The trial court, the factfinder in this tragic case, made its finding of guilt based on the totality of the evidence before it. The court was well aware that, as the parties stipulated at trial, there was no evidence that appellant was not a good child care provider prior to the incident resulting in Noah's death. The court knew of the precautions appellant took on the day of Noah's death. The trial court was also aware of the parties' stipulation that appellant was cooperative and noticeably distraught in describing the incident to the police. It was within the trial court's purview to assign an appropriate weight to such facts in light of all the evidence presented at trial, including the evidence in the record supporting a finding of guilt. "If there is evidence to sustain the verdict, the reviewing court 'should not overrule it and substitute its own judgment, even if its opinion might differ from that of the [factfinder].'" Cable, 243 Va. at 239, 415 S.E.2d at 220 (quoting Snyder v. Commonwealth, 202 Va. 1009, 1016, 121 S.E.2d 452, 457 (1961)). Because there was sufficient credible evidence to support a rational factfinder's decision that appellant was criminally negligent and, therefore, was guilty of involuntary manslaughter beyond a reasonable doubt, we will not overrule its judgment.

In summary, the act of attempting to limit Noah's ability to stand in his crib was not inherently unlawful; however, a rational factfinder could indeed determine that the placing of a thirty-three-pound dog crate on Noah's crib, combined with appellant's inattentiveness in the face of this experimental and dangerous set-up and with Noah's conceded determination to stand up in his crib, constituted reckless and unlawful conduct in utter disregard of Noah's safety. See Gooden, 226 Va. at 573, 311 S.E.2d at 785 (differentiating inherently unlawful acts and the improper performance of lawful acts). Because reasonable minds could make a determination here that appellant was criminally negligent, cf. Tubman, 3 Va. App. at 273-74, 348 S.E.2d at 875, we conclude the trial court did not err in finding her guilty of involuntary manslaughter.

### III. Conclusion

For the foregoing reasons, we affirm appellant's conviction.

<u>Affirmed.</u>

Elder, J., dissenting.

I would dissent for the reasons set forth in the January 13, 2009 dissenting opinion of the panel.  See Noakes v. Commonwealth, No. 0295-08-2, 2009 VA. App. LEXIS 12, at *19-25 (Clements, J., dissenting) (Va. Ct. App. Jan. 13, 2009).