COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, AtLee and Callins
Argued by videoconference

UNPUBLISHED

EDDIE RIVERS, III

MEMORANDUM OPINION[*] BY
v.      Record No. 0746-23-2          JUDGE RICHARD Y. ATLEE, JR.
DECEMBER 17, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
William E. Glover, Judge

Lauren Brice, Assistant Public Defender (Virginia Indigent
Defense Commission, on briefs), for appellant.

S. Hallie Hovey-Murray, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Appellant Eddie Rivers, III challenges his conviction for driving in a manner that

endangered the life, limb, or property of another while his license was revoked. He argues that

the trial court erred in finding the evidence sufficient because it failed to show Rivers: (1) had

notice that his license was revoked on the day of the offense and (2) drove in a manner that

endangered the life, limb, or property of another. For the following reasons, we disagree and

affirm.

I. BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the

sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the

Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74

Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

So viewed, one evening in August 2022, Spotsylvania County Sheriff's Deputy Cory Cox was driving in his patrol vehicle near Lansdowne Road. He observed a silver Chevy Malibu with temporary tags driving in front of him. He noticed the sedan repeatedly weave back and forth in the lane. When approaching train tracks, it appeared to cross over the solid "double yellow" center lane marker. Cox was driving at the speed limit of 35 miles per hour while the sedan had "a good burst of speed" and was pulling away from Cox. The road had no potholes, debris, or other faults that could explain the weaving. Because Cox had someone in custody, he was unable to make a traffic stop himself, so he asked Deputy Luis Dus, who was in a cruiser behind him, to conduct a stop of the vehicle. The Malibu turned left into a shopping center's parking lot. Cox's dashcam recorded the entire incident.

Dus, who was "[l]ess than a minute" behind Cox, saw the silver Malibu as it turned left into the shopping center. He followed it and initiated a stop by turning on his blue lights and parking behind the sedan. Rivers got out of the sedan, along with his 13-year-old son. Despite Dus's commands, Rivers and his son went into "FXBG AXES," an axe-throwing bar. "For officer safety reasons," Dus called for backup and waited for another deputy to arrive before entering the bar.

After Deputy Tim Frederickson arrived, the deputies entered the bar and found and spoke to Rivers. Dus explained that this was a traffic stop and asked why Rivers had ignored him when he told him to remain in his car. When asked for his identification, Rivers refused, saying "you

don't need my ID." Dus described Rivers as uncooperative. He also noted that Rivers had "glassy eyes" and "inconsistent[ly]" slurred speech.

The deputies handcuffed Rivers and led him and his son outside to further investigate whether Rivers had been driving under the influence. When asked once again to provide his license, Rivers repeatedly refused because he insisted he had "do[ne] nothing wrong." He was non-responsive when asked if he had his identification on him; Dus removed Rivers's wallet from his pocket, finding it contained a Virginia identification card instead of a driver's license. Officers also noted aloud that the registered owner of Rivers's car had a revoked license and ultimately confirmed over the radio that Rivers's license was revoked. When a voice over the radio said he was "status revoked; DUI-related; two previous notices received," Rivers did not deny this, but instead insisted again that he had done nothing wrong. When an officer responded "well, you were driving without a license," Rivers said he would have someone come pick him up. Although Rivers maintained that he had done nothing wrong, repeatedly emphasizing that he committed no driving infractions, at no point did he express surprise or disbelief when repeatedly told that his license was revoked.

Frederickson "took over" from Dus and began talking to Rivers. He noted that Rivers was "agitated" and had "blood red shot eyes, watery eyes." He noted "a strong odor of alcoholic beverage coming from" Rivers. Frederickson asked Rivers to perform several field sobriety tests. In the horizontal gaze nystagmus test, Rivers "showed six out of six clues" indicating intoxication.[1] He then instructed Rivers to perform a "walk and turn,"[2] which Rivers argued he

---

[1] Frederickson explained that the test has three indicators per eye, for a total of six: smooth pursuit, nystagmus (or involuntary jerking of the eye) "at maximum deviation," and nystagmus onset "prior to 45 degrees."

[2] "You put your left foot on the line, you put your right foot in front of the left in front of your left foot, heel to toe, you put your arms down to your side and that's the starting position and then you just wait for further instructions."

would be unable to perform because of a broken foot. Frederickson said he would take that into account, and ultimately he found that Rivers showed "four out of eight clues" of intoxication. When asked to perform a "one leg stand," Rivers was unable to follow instructions. Throughout the encounter, Rivers repeatedly expressed his frustration and vocalized his concerns about how his son would get home, trying to propose alternatives to being arrested.

Rivers performed a preliminary breath test, and when he saw the result, claimed "something's wrong with that." The warrant for Rivers's arrest indicated that his blood alcohol level was at least 0.15, but not more than 0.20.

The deputies placed Rivers under arrest for driving under the influence ("DUI"). When searching Rivers's vehicle, Dus found an open container of Bud Light "right underneath the driver seat." It was about "halfway full" and was "still cold." Rivers admitted he had been drinking that beer. The compartment on the driver-side door had, among other things, a number of small unopened bottles of Fireball whiskey. Upon searching Rivers's person, police found another small bottle of whiskey.

Rivers was charged with DUI, under Code § 18.2-266, and one count of driving in a manner that endangered the life, limb, or property of another while his license was revoked, in violation of Code § 46.2-391(D). At trial, the Commonwealth introduced certified copies of Rivers's prior convictions for DUI and DUI, second offense, from October 25, 2018.[3] The warrants from the general district court showed that Rivers was present in court, pleaded guilty to both charges, and was convicted and sentenced. The first warrant ordered that his license was suspended for 12 months, and the second ordered a three-year suspension. The Commonwealth also introduced a certified DMV transcript that listed a license revocation issued on November 6, 2018, due to these two convictions. The transcript further showed that on March 18, 2021,

---

[3] Rivers was in court for two separate DUI arrests from April and June of that year.

Rivers was convicted, in absentia, of driving while his license was suspended or revoked. It reflected that he was sent notice of this conviction at his home address by "ORDER 1ST CLS MAIL."

Additionally, the trial court admitted into evidence Cox's dashcam footage, Dus's body camera footage, and photos taken of Rivers's vehicle. At the close of the Commonwealth's case, Rivers moved to strike, arguing there was inadequate evidence that he had notice that his license was revoked for the endangerment charge, or that he was intoxicated for the DUI charge. The trial court denied the motion as to both charges. Rivers did not present evidence, and at the close of the evidence, renewed his motion to strike, which the trial court again denied.

The trial court found Rivers not guilty on the DUI charge, and it convicted him of one count of driving in a manner that endangered the life, limb, or property of another while his license was revoked. He received a sentence of five years in prison, with three years and ten months suspended. Rivers filed a motion to set aside the verdict, which, following a hearing, the trial court denied. This appeal followed.

## II. ANALYSIS

Rivers challenges the sufficiency of the evidence in two respects. First, he argues that the evidence did not prove that he had notice that his license was revoked at the time of the instant offense. Second, he claims the evidence fails to show that his driving "endanger[ed] the life, limb, or property of another" under Code § 46.2-391(D)(2). For the following reasons, we find no reversible error.

### A. *Standards of Review*

When considering the sufficiency of the evidence in a criminal appeal, "we review the evidence in the 'light most favorable' to the Commonwealth," and we draw all reasonable inferences that flow from that evidence. *Cady*, 300 Va. at 329 (quoting *Commonwealth v.*

*Hudson*, 265 Va. 505, 514 (2003)).  In other words, we follow "the long[-]established standard of review that the factfinding of a lower court receives 'the highest degree of appellate deference.'" *Noakes v. Commonwealth*, 54 Va. App. 577, 586 (2009) (quoting *Thomas v. Commonwealth*, 48 Va. App. 605, 608 (2006)).  "[A]n appellate court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *Cady*, 300 Va. at 329 (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).  "Instead, the only 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).  "[T]he possibility that another rational factfinder *could* have found differently does not mean that *no* rational factfinder would have found" an appellant guilty.  *Noakes*, 54 Va. App. at 586.  Therefore, "[o]nly in the event that reasonable minds would be *compelled* to agree that [an] appellant's actions were not criminally culpable could we, as an appellate court, find the evidence . . . insufficient."  *Id.* (emphasis added).  To the extent that our analysis requires statutory interpretation, those are issues of law that we review de novo.  *Walker v. Commonwealth*, 302 Va. 304, 321 (2023).

### B. Notice

First, Rivers argues that the evidence failed to show he had notice that his license was revoked at the time of his arrest.  As relevant here, there are two statutory schemes that address the effects of a conviction for DUI: Code § 18.2-271,[4] a criminal statute, and Code § 46.2-391,

---

[4] Under Code § 18.2-271(A), a conviction of Code § 18.2-266, first offense, "shall of itself operate to deprive the person so convicted of the privilege to drive or operate any motor vehicle . . . in the Commonwealth for a period of one year from the date of such judgment."  If a person is convicted of Code § 18.2-266, second offense, "such conviction shall of itself operate to deprive the person so convicted of the privilege to drive . . . in the Commonwealth for a period of three years from the date of the judgment of conviction," and "such person shall have his license revoked as provided in subsection A of § 46.2-391."  Code § 18.2-271(B).

which falls under the motor vehicle code. Rivers acknowledges that he received notice under Code § 18.2-271,[5] but, because over three years had elapsed since his most recent DUI conviction, and the evidence allegedly failed to show that Rivers knew the prior DUI revocation periods would run consecutively, he argues that he did not have notice that his license remained revoked. Rivers additionally argues that, because he was convicted under Code § 46.2-391(D),[6] the notice he had of revocation under Code § 18.2-271 was insufficient, and the Commonwealth was required to affirmatively prove he had notice under the article containing Code § 46.2-391.

Code § 46.2-391(A) states that

> The [DMV] Commissioner shall forthwith revoke and not thereafter reissue for three years the driver's license of any person on receiving a record of the conviction of any person who (i) is adjudged to be a second offender in violation of . . . § 18.2-266 (driving under the influence of drugs or intoxicants), if the subsequent violation occurred within 10 years of the prior violation.

Rivers initially focuses on Code § 46.2-416, a provision that details two methods that provide prima facie evidence that someone has received notice that their license was revoked under Code § 46.2-391. First, "notice of the suspension or revocation or any certified copy of the decision or order of the Commissioner may be sent by the Department by certified mail to the driver at the most recent address of the driver on file at the Department." Code § 46.2-416(A). Second, notice may also be provided via "service on the driver . . . made by delivery in writing to the

---

[5] At trial, counsel stated that "by operation of law, a revocation of three years as soon as the conviction happens. And there's no dispute in this case and we are not disputing that there was notice given [under Code § 18.2-271]. What was not given though is notice of the revocation pursuant to [Code § 46.2-]391."

[6] "Any person convicted of driving a motor vehicle or any self-propelled machinery or equipment (i) while his license is revoked pursuant to subsection A or B" when "such driving (i) of itself endangers the life, limb, or property of another . . . is guilty of a felony . . . ." Code § 46.2-391(D)(2)(a).

driver in person in accordance with subdivision 1 of § 8.01-296 by a sheriff or deputy sheriff." *Id.*

Yet, as Rivers acknowledges, Code § 46.2-416 does not state that these are the *only* methods by which one can prove that an offender had notice of their license revocation. Either direct or circumstantial evidence can prove that an individual received actual notice as well. "Circumstantial evidence 'is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt,'" *Bennett v. Commonwealth*, 69 Va. App. 475, 492 (2018) (quoting *Ward v. Commonwealth*, 47 Va. App. 733, 751 (2006)), and a trial court is "entitled to rely on the totality of the circumstances" in rendering its judgment, *id.* at 494.

With that in mind, as a preliminary matter, we note that we must apply the "presumption of regularity"; therefore, absent any evidence indicating otherwise, we assume that the DMV commissioner sent, and Rivers received, notice of his license revocation as required by Code § 46.2-391. *See Smith v. Commonwealth*, 44 Va. App. 189, 194 (2004) ("In the absence of clear evidence to the contrary, courts may presume that public officers have properly discharged their official duties." (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 856-57 (1991))). The DMV Commissioner is a public officer whose duties are entitled to that presumption. *Id.*; *see also Clements v. Commonwealth*, 43 Va. App. 56, 60 (2004).

Rivers directs the Court to *Bibb v. Commonwealth*, 212 Va. 249 (1971), where a conviction was overturned for insufficient evidence of notice, but his reliance upon that case is misplaced. In *Bibb*, there was affirmative evidence indicating that the defendant did not receive notice of his license revocation. Because of that evidence, "the Commonwealth [could ]not rely on the presumption [of regularity] because its evidence *expressly shows* that Bibb did not receive the notice mailed to him." *Bibb*, 212 Va. at 250 (emphasis added). Here, there is no affirmative

evidence that Rivers did not receive notice, and therefore, we presume that the DMV Commissioner performed his official duties and provided Rivers notice as required by Code § 46.2-391. Therefore, we cannot and do not reach a similar conclusion as that in *Bibb*.

Furthermore, even putting this presumption aside, there was ample evidence that Rivers was aware that his license was revoked at the time of the incident. At the threshold, when officers asked for Rivers's identification, Rivers, without explanation, refused to provide one. When an officer retrieved Rivers's wallet, it contained a state identification card, rather than a valid driver's license. The salience of these facts is magnified when viewed vis-à-vis Rivers's DMV transcript, which documented Rivers's lengthy history of having his driver's license revoked. Within the four years prior to his arrest here in August 2022, Rivers's license was (1) revoked on November 6, 2018, based on two convictions for DUI[7]; (2) revoked on April 16, 2019, pursuant to Code § 46.2-390.1[8]; and (3) revoked again on March 31, 2021, for driving on his already-revoked license. The DMV transcript also indicated that notice of his convictions was sent to Rivers's home address.[9]

---

[7] Rivers's conviction orders, admitted at trial, reflected that at the time of his two DUI convictions in 2018, Rivers was present in court, represented by counsel, and that he pled guilty to both charges, resulting in his license being revoked for a period of twelve months and three years, respectively.

[8] This code section, repealed in 2020, concerned license revocations resulting from non-motor-vehicle-related offenses.

[9] Rivers argues that notations "ORDER PENDING RESP" in the DMV transcript "call into question" whether he received actual notice of his DUI-related revocations and their respective length. We disagree. First, that specific notation appears only next to the entries that concern notice of revocation with respect to the 2018 DUI convictions for which Rivers was present for in court and pleaded guilty. Furthermore, Rivers's DMV transcript clearly indicates that, as to each of license revocations or suspensions he incurred during the relevant period, notice was sent to Rivers via first class mail. Finally, the top of the DMV transcript includes an emphasized notation, "NOTICE OF SUSPENSION/REVOCATION RECEIVED."

Viewing these facts in the totality, a reasonable factfinder could conclude that Rivers had actual notice that his license was revoked at the time of his arrest in August 2022. Because of Rivers's lengthy history of suspensions and revocations, it could be fairly inferred that Rivers understood the consequences of a license revocation, and the limitations placed on him as a result thereof. In fact, Rivers knew these consequences well, as evidenced by his conviction for driving on a revoked license in March 2021. By logical extension, a reasonable factfinder could have, and did, conclude that Rivers: (1) knew that his license was revoked, (2) in light of this knowledge and this lack of a license, Rivers obtained a state-issued identification card, (3) concealed this fact from the police by refusing to furnish identification, and (4) did so to avoid the police charging him with a crime.

At trial, defense counsel even conceded that Rivers was aware his license was revoked and that he was not free to drive. Rivers's counsel acknowledged that "[Rivers's] license was revoked pursuant to 27[1]" and "[Rivers] was not free to drive because his license was revoked pursuant to 27[1],"[10] affirming that Rivers had notice of his revoked status. We find Rivers's argument unpersuasive that, at least as applied to these facts, having notice of revocation under Code § 18.2-271 is insufficient evidence of notice of revocation for a conviction under Code § 46.2-391. Finally, Rivers offered no rebuttal evidence to support his argument that he did not have notice of his license revocation, a circumstance that the trial court was able to consider. *Cf. Yoder v. Commonwealth*, 298 Va. 180, 183 n.1 (2019) ("[T]he failure to produce available evidence is 'a circumstance,' but 'not a presumption,' that a factfinder may consider." (quoting *Pollino v. Commonwealth*, 42 Va. App. 243, 251 (2004))). Accordingly, viewed in its totality,

_____

[10] It appears defense counsel misspoke at this moment, as the transcript indicates she said "272," but it is plain from context that she meant "271."

the trial court did not err in finding the evidence sufficient to prove that Rivers had notice that his license was revoked at the time of the stop.

### C. *Endangerment*

We turn next to Rivers's argument that the evidence failed to show that his driving "endanger[ed] the life, limb, or property of another," which is required for a felony conviction for driving on a revoked license under Code § 46.2-391(D)(2)(a)(i).

"If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). Critically, we even owe this deference to a factfinder's interpretation of images or video evidence, regardless of the fact that we are viewing that same evidence on appeal. *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). Unlike our deference on issues of credibility, "[s]uch deference stems not from the trial court being in a superior position to view the video evidence[,] but from the difference in our respective roles." *Id.* "As factfinder, a trial court views video and other evidence to determine what it believes happened," but, "on appellate review, [we] view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did." *Id.*

Here, law enforcement first became concerned when seeing Rivers was repeatedly swerving and weaving within his lane of travel, at one point even appearing to cross over the solid "double yellow" center lane marker into the lane for oncoming traffic. All of this was captured on a police cruiser's dashboard camera. In finding Rivers guilty, the trial court emphasized in particular the evidence of Rivers's intoxication. Multiple officers testified that Rivers smelled of alcohol, had glassy and bloodshot eyes, and slurred speech. He failed several field sobriety tests and

repeatedly failed to follow the officers' instructions. In addition to the unopened bottles of liquor in his car and on his person, there was a half-drunk can of beer, still cold, by the driver's seat, which Rivers admitted to consuming. Finally, the warrant for Rivers's arrest indicated that his blood alcohol level was at least 0.15, but not more than 0.20, when arrested.

Even though the trial court decided that "the evidence was not sufficient to prove beyond a reasonable doubt that [Rivers] operated [his vehicle] under the influence," it went on to explain that it nonetheless "absolutely [wa]s sufficient to prove that he operated a motor vehicle in a way that was a danger to himself, his son and other people operating on the roadway." In so finding, it emphasized that there was "strong indicia that [he] had been drinking prior to and during the operation of the motor vehicle," including the open container of beer, various small bottles of liquor, and his performance on the field sobriety tests.

In short, "the possibility that another rational factfinder *could* have found differently does not mean that *no* rational factfinder would have found" Rivers guilty of felony driving on a revoked license. *Noakes*, 54 Va. App. at 586. The trial court, having reviewed the evidence, found that Rivers "was driving [the car] in a manner that endangered himself, his son and other people on the road while he was revoked." Viewing the evidence in its totality, and through the appropriate evidentiary lens, we cannot say the trial court erred in convicting Rivers for driving in a manner that endangered the life, limb, or property of another while his license was revoked.

## III. CONCLUSION

For the reasons stated, we find no reversible error in the trial court's conclusions that the evidence was sufficient to show both notice and endangerment. Therefore, we affirm the conviction.

*Affirmed.*